BLANK ROME LLP
MICHAEL JOSEPH (pro hac vice)
JOSEPH O. CLICK (pro hac vice)
KERRY BRAINARD (pro hac vice)
600 New Hampshire Ave., N.W.
Washington, D.C.  20037
Telephone: 202/772-5966
202/572-8361 (fax)

BINGHAM MCCUTCHEN LLP
DALE BARNES (SBN 99273)
Three Embarcadero Center
San Francisco, CA  94111
Telephone: 415/393-2522
415/393-2286 (fax)

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re IMPAX LABORATORIES, INC. SECURITIES LITIGATION | ) ) ) |
| | ) |
| This Document Related To: | ) ) |
| ALL ACTIONS. | ) ) ) ) ) ) |

Master File No. C-04-4802-JW

<u>CLASS ACTION</u>

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED CONSOLIDATED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Date:     December 12, 2005
Time:     9:00 a.m.
Place:    Courtroom 8, 4th Floor
Judge:    Hon. James Ware

*(left margin)* **Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

# TABLE OF CONTENTS

**PAGE NO.**

Table of Authorities .................................................................................................. iii

Introduction ............................................................................................................... 1

Statement of Facts ..................................................................................................... 2

A.   The Parties. ...................................................................................................... 2

B.   The Strategic Alliance Agreement with Teva. ................................................ 2

C.   The Initial Sales of Bupropion and Impax's Quarterly
     Financial Statements. ....................................................................................... 3

D.   Impax's Delay of its Third-Quarter 2004 Results ........................................... 4

E.   Impax's Restatement of its First- and Second-Quarter 2004 Results. ............ 5

F.   Subsequent Events ........................................................................................... 6

G.   The Amended Complaint ................................................................................. 7

Argument .................................................................................................................... 8

    I.    Applicable Legal Standards. ..................................................................... 8

          A.    Rules 9(b) and 12(b)(6) and the PSLRA. ....................................... 8

          B.    Section 10(b) of the Securities Exchange Act of 1934
                and Rule 10b-5. ................................................................................ 9

    II.   The Complaint Does Not Allege Facts Giving Rise to an Inference
          of Scienter. ................................................................................................ 9

          A.    The Complaint's Allegations Negate an Inference of Scienter. .......... 10

          B.    Plaintiffs' Other Allegations Concerning Impax's Financial
                Statements Do Not Raise any Inference of Scienter,
                Much Less a Strong Inference. ...................................................... 11

                1.    The Allegations Concerning the Teva Customer Credits ....... 11

                2.    The Reserve for Returned Products and the Alleged
                      Violations of GAAP. ............................................................ 12

          C.    Plaintiffs' Other Scienter Allegations Fail to Raise any Inference
                of Scienter, Much Less a Strong Inference ................................... 11

i

Blank Rome LLP

Watergate  600 New Hampshire Ave, NW  Washington, DC 20037

1.     Allegations Regarding Excess Inventory.................................18

2.     The Individual Defendants' Status in the Company.................19

3.     The Defendants' Stock Sales. ....................................................20

4.     Impax not First to Market. ........................................................23

5.     Executive Compensation. ..........................................................24

D.     The Totality of the Allegations Fail to Raise any Inference
of Scienter, Much Less a Strong Inference. ..........................................25

III.     The Complaint Fails to Allege Loss Causation. ..............................................26

IV.     The Complaint Fails to State a Claim for Control Person Liability. ...............29

Conclusion ....................................................................................................................30

**Blank Rome LLP**

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**TABLE OF AUTHORITIES**

**PAGE NO.**

**FEDERAL CASES**

*In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935 (E.D. Pa. 1999) ....................................................9

*Anderson v. Clow* (*In re Stac Electronics Sec. Litig.*), 89 F.3d 1399
    (9th Cir. 1996) .......................................................................................................................8

*In re Apple Computer*, 886 F.2d 1109 (9th Cir. 1989) ...............................................................20, 24

*In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833 (N.D. Cal. 2000)...........................................19

*In re Bristol-Myers Squibb Sec. Litig.,*312 F. Supp. 2d 549 (S.D.N.Y. 2004) ...............................16

*Bloom v. Martin*, 865 F. Supp. 1377 (N.D. Cal. 1994), *aff'd*, 77 F.3d 318
    (9th Cir. 1996) .......................................................................................................................8

*Berger v. Ludwick*, 2000 WL 1262646 (N.D. Cal. Aug. 17, 2000),
    *aff'd,* 15 Fed. Appx. 528 (9th Cir. 2001) ..........................................................................24

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002)...............................................23

*In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054 (N.D. Cal. 2003) ......................................24

*In re Cirrus Logic Sec. Litig.,* 946 F.Supp. 1446 (N.D. Cal. 1996).........................................15, 16

*In re 3Com Sec. Litig., 1999 WL103791*(July 8, 1999, N.D. Cal.)....................................................2

*In re CornerstonePropane Partners, L.P. Sec. Litig.*,
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) .................................................................18, 24, 29

*DSAM Global Value Fund. v.  Altris Software, Inc.*, 288 F.2d 385
    (9th Cir. 2002)........................................................................................................... *passim*

*In re Daou Systems, Inc. Sec. Litig.*, 2005 WL 1431833 (9th Cir. June 21, 2005).................25, 27

*Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541 (9th Cir. 1994) ........15, 16

*Dura Pharms., Inc. v. Broudo*, 125 S. Ct. 1627(2005) .........................................................9, 26, 27

*In re FVC.com*, 2002 WL 465161 (9th Cir. March 15, 2002) ......................................................17

iii

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

*In re FVC.com Sec. Litig.*, 136 F.Supp.2d 1031 (N.D. Cal. 2000), *aff'd*, 32 Fed. Appx. 338 (9th Cir. 2002) ..............................................................................21, 22

*Fisher v. Vantive Corp. (In re Vantive Corp. Sec. Litig.)*, 283 F.3d 1079 (9th Cir. 2002) ........................................................ *passim*

*Florida State Bd. of Admin v. Bay Networks, Inc.*, 1998 WL 34187566 (N.D. Cal. Sept. 15, 1998) ..........................................................................................................25

*In re Gilead Sciences Sec. Litig.*, 2005 WL 181885 (N.D. Cal. Jan. 26, 2005)................................2

*Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002) ................................................10

*Halkin v. VeriFone, Inc. (In re VeriFone Sec. Litig.)*, 11 F.3d 865 (9th Cir. 1993) ......................8

*Haney v. Pacific Telesis Group*, 2000 WL 33400194 (C. D. Cal. Sept. 19, 2000) ......................24

*Janas v. McCracken (In re Silicon Graphics Sec. Litig.)*, 183 F.3d 970 (9th Cir. 1999).............................................................................................. *passim*

*Kane v. Madge Networks N.V.*, 2000 WL 33208116 (N.D. Cal. May 26, 2000), *aff'd*, 32 Fed. Appx. 905 (9th Cir. 2002) ................................................18

*Kuebeck v. Genesis Microchip, Inc.*, 2005 WL 1787426 (N.D. Cal. July 27, 2005)...........19

*Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000) ....................................................2

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d. Cir. 2005)........................................27

*Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002)................................23, 24

*Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734 (N.D. Cal. June 8, 1994) .............16

*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000)..........................................................................13, 24

*In re Metawave Communs. Corp. Sec. Litig.*, 298 F. Supp. 2d 1056 (W.D.Wash. 2003) ...........................................................................17

*Miller v. Pessani (In re Worlds of Wonder Sec. Litig.)*, 35 F.3d 1407 (9th Cir. 1994) ................12

*In re Network Assoc., Inc., II Sec. Litig.*, 2003 WL 24051280 (N.D. Cal. March 25, 2003) ........16

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) .................................................18

iv

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

*In re Oak Tech. Sec. Litig.*, 1997 WL 448168 (N.D. Cal. Aug. 1, 1997) ......................................16

*In re Peerless System Corp. Sec. Litig.*, 182 F. Supp. 2d 982
(S.D. Cal. 2002) ........................................................................................................................20

*Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003) ............................................................9

*In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051
(N.D. Cal. 2002).........................................................................................................................29

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001).....................................................................8, 15, 21

*In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161 (D. Mass 2000) ...............................16

*In re Silicon Graphics Sec. Litig.*, 970 F. Supp. 746 (N.D. Cal. 1997) ...........................................9

*Sogbandi v. Markham*, 2002 WL 31855299 (N.D. Cal. Dec. 17, 2002) ........................................8

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir. 1998) ..............................................2, 8

*In re Sun Healthcare Group, Inc. Sec. Litig*, 181 F. Supp. 2d (D.N.M. 2002)...........................16

*In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp.2d 1149 (C.D. Cal. 2004) ...............................21

*In re United States Aggregates, Inc. Sec. Litig.*, 184 F. Supp. 2d 1063 (N.D. Cal. 2002).13, 16, 20

*Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102 (N.D. Cal. 2003) ................................2

*Yourish v. California Amplifier*, 191 F.3d 983 (9th Cir. 1999) .......................................................9

*Zelman v. JDS Uniphase Corp.*, 2005 WL 1649042 (N.D. Cal. July 13, 2005).........................27

## STATUTES RULES AND REGULATIONS

15 U.S.C. § 78u-4(b)(1) ...........................................................................................1, 8, 9, 15

15 U.S.C. § 78u-4(b)(2) ...............................................................................................................9

15 U.S.C. § 78u-4(b)(3) ...............................................................................................................9

15 U.S.C. § 78j(b) ........................................................................................................................9

17 C.F.R. § 240.10b-5 ..................................................................................................................9

Fed. R. Civ. Pro 9(b) ...................................................................................................................9

v

Fed. R. Civ. Pro. 12(b)(6) ...................................................................................................8

**OTHER AUTHORITIES**

Accounting Principles Board Opinion No. 20 ....................................................................16

Emerging Issues Task Force No. 00-21 .............................................................................13

FASB Financial Accounting Statement No. 48 .................................................................13

FASB Statements of Concepts Nos. 1 and 2.....................................................................12

SEC Staff Accounting Bulletin 104 .................................................................................13

**Blank Rome LLP**

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**Blank Rome LLP**

Watergate  600 New Hampshire Ave, NW  Washington, DC 20037

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 12, 2005, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 8 of the above entitled Court, located at 280 South 1st Street, San Jose, California, 95113, before the Honorable James Ware, defendants Impax Laboaratories, Inc. ("Impax"), Barry R. Edwards, Charles Hsiao, Larry Hsu, David J. Edwards, Cornel C. Spiegler, and David S. Doll will and hereby do move the Court for an order dismissing with prejudice Plaintiffs' First Amended Consolidated Complaint (the "Complaint").  This motion is made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (the "PSLRA") on the grounds that the Complaint fails to state a claim upon which relief can be granted and fails to comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, the records on file with the Court in this matter, as well as such other matters that the Court may properly consider before or at the hearing on this matter.

### MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

Impax Laboratories, Inc. is a publicly held pharmaceutical company that, in announcing its financial results for the third quarter of 2004, restated its results for the two preceding quarters.  As night follows day, these class actions followed, resting upon the usual faulty premise:  if the original numbers were wrong, there must have been fraud.  The very documents on which plaintiffs rely, however, affirmatively show that the restatements were based upon information that was not available to the defendants when the original financial statements were issued, and plaintiffs thus cannot plead facts raising even a reasonable inference of scienter, let alone the required strong inference.  In addition, plaintiffs cannot plead that the allegedly false financial statements caused any loss.  The Complaint must therefore be dismissed.

**Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

**Statement of Facts**

The Complaint relies largely upon the misconstruction, misinterpretation, or misunderstanding of various documents of which the Court may take judicial notice and consider on this motion to dismiss.  These include company press releases, reports filed with the SEC, and historical stock prices.[1]  Accordingly, the following is drawn from the Complaint's allegations, as well as the relevant documents where necessary and appropriate.

### A.    The Parties.

Lead plaintiff, United Food & Commercial Workers Union Local 655, AFL-CIO, Food Employers Joint Pension Plan, purchased 25,000 shares of Impax stock on May 24, 2004 at a price of $19.73.  It sold all of this stock between August 4 and October 15, 2004 at prices ranging from $10.95 to $14.79.  Complaint, ¶ 8, and Exhibit A thereto.

Defendant Impax is a specialty pharmaceutical company that develops and markets generic and brand name pharmaceuticals.  *Id.*, ¶ 10.  Also named as defendants are Barry Edwards, Impax's CEO and a director, Charles Hsiao, chairman of Impax's board, Larry Hsu, president and a director, Cornel Spiegler, the company's former CFO, David Doll, its Senior Vice President for Sales and Marketing, and David Edwards, a director.  *Id.*, ¶¶ 11-16

### B.    The Strategic Alliance Agreement with Teva.

In June 2001, Impax entered into a Strategic Alliance Agreement ("SAA") with a subsidiary of Teva Pharmaceutical Industries Ltd., a multi-billion dollar global pharmaceutical company with a leading position in the U.S. market.  *Id.*, ¶¶ 23-24.  The SAA gives Teva exclusive marketing rights with respect to certain products manufactured by Impax, including Bupropion 100 mg and 150 mg controlled-release tablets.[2]  *Id.*, ¶ 23.  Under the SAA, Impax is required to manufacture and supply

---

[1]  *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000) (documents whose contents are alleged in complaint); *Janas v. McCracken* (*In re Silicon Graphics Sec. Litig.*), 183 F.3d 970, 986 (9th Cir. 1999) (reports filed with the SEC referenced or relied upon in complaint); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) (documents to which complaint refers); *In re Gilead Sciences Sec. Litig.*, 2005 WL 181885 at *3 (Jan. 26, 2005 N.D. Cal.) (press releases referenced in complaint); *Wietschner v. Monterey Pasta Co.,* 294 F. Supp. 2d 1102 (N.D. Cal. 2003) (press releases and SEC Form 4s); *In re 3Com Sec. Litig.*, 1999 WL 1039715 at *4 (N.D. Cal. July 8, 1999) (daily closing prices of stock).

[2]  Bupropion is the generic name for the anti-depressant Wellbutrin SR®.

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Teva with all of Teva's requirements for the products covered by the SAA.  *Id.*, ¶ 24.  Teva pays Impax its manufacturing costs and shares with Impax the profit—defined as net sales less manufacturing costs—on Teva's sales of the products.  *Id.*, ¶¶ 24, 52; Ex. A at § 1.4.20; § 1.4.33; § 11.3.[3]

The Complaint acknowledges, based on Impax's SEC Form 10-Q reports, that Impax recognizes revenue from Teva's sales of Impax products, not when Impax delivers products to Teva, but when title and risk of loss transfer from Teva to Teva's customers.  Complaint, ¶ 53.  The Complaint further acknowledges that the SAA grants Teva the exclusive right to determine all terms and conditions of sale to its customers, including price, discounts, allowances, price adjustments, returns and rebates.  *Id.*

The financial statements upon which plaintiffs base their claim also disclose that Teva provides Impax with a "financial report detailing . . . [Teva's] gross sales less applicable chargebacks, rebates and other credits to arrive at net sales, cost of sales information and gross margins for the Bupropion products."  *See* Exs. B at 5; C at 5.  To facilitate Impax's accounting for its share of the profits from Teva's sales, the SAA requires Teva to report to Impax within 30 days of the end of each calendar quarter the net sales and profit for such quarter.  Ex. A at § 11.3.  The SAA defines "net sales" as the gross amount invoiced by Teva, less, among other things, discounts, allowances, rebates, and credits for returned products, "in each case determined in accordance with U.S. GAAP," *id.* at § 1.4.26, and requires Teva to calculate and report net sales in accordance with U.S. GAAP.  *Id.* at § 11.8.

**C.    The Initial Sales of Bupropion and Impax's Quarterly Financial Statements.**

Prior to the first quarter of 2004, Impax had never earned a profit.  Complaint, ¶ 2.  During the first quarter of 2004, the FDA approved Impax's application for permission to market Bupropion

---

[3]  Because the Complaint references and relies on the SAA (*e.g.*, *id.*, ¶¶ 23, 24, 53-55), the Court may consider the SAA on this motion to dismiss .  A copy of the SAA, which is publicly available as exhibit 10.55 to Impax's SEC reports, is attached as Exhibit A to the accompanying Request for Judicial Notice.  References herein to "Ex.—" are to exhibits to this Request.

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

100 mg and 150 mg controlled-release tablets.  *Id.*, ¶¶ 22, 28.  As a result, Teva began to sell these products in that quarter.

On May 5, 2004, Impax issued a press release announcing its first-quarter 2004 results.  *Id.*, ¶¶ 26, 88.  Total revenue was $38.8 million, with sales of Bupropion accounting for 61 percent, or $26.6 million.  *Id.* ¶ 89.  Impax's first-quarter 2004 SEC Form 10-Q, filed on May 10, reflected the same amounts.  *Id.*  Significantly, note 1 to the financial statements, entitled "Critical Accounting Policy Related to Revenue Recognition," explained how Impax recorded revenue for sales of Bupropion:

> Revenues from product sales for [Bupropion] under our strategic alliance [with Teva] are recognized at the time title and risk of loss transfers to Teva's customers.  … Teva ships the Bupropion products to its customers and reports the results on a monthly basis.  Teva provides to IMPAX a financial report detailing its gross sales *less applicable chargebacks, rebates and other credits* to arrive at net sales, cost of sales information and gross margins for the Bupropion products.  *The information on the financial report is used by IMPAX to record its monthly revenue for the Bupropion 100 mg and 150 mg products*.  Additionally, the amount of revenue that IMPAX earns is based on a fixed gross margin sharing percentage.

Ex. B at 5 (emphasis added).

Impax's financial statements thus made clear, with respect to revenue from sales of Bupropion under the SAA, that Teva provided Impax with reports of revenue, that the revenue reported was net of "chargebacks, rebates and other credits," and that Impax used the revenue information provided by Teva to record its own revenue.  Stated differently, the revenue reflected on Impax's financial statements was Impax's share of Teva's Bupropion revenue, from which Teva had already deducted chargebacks, rebates and other credits.

On August 4, 2004, Impax announced its second-quarter 2004 results.  Complaint, ¶ 95.  Total revenue was $30.8 million, of which $8.1 million was Impax's share of Teva's sales of Bupropion.  *Id.*  Impax's second-quarter 2004 SEC Form 10-Q, filed on August 9, reflected the same amounts.  *Id.*, ¶¶ 26, 96.  The financial statements accompanying the Form 10-Q repeated Impax's revenue-recognition policy with respect to Teva's sales of Bupropion.  Ex. C at 5.

**D.    Impax's Delay of its Third-Quarter 2004 Results.**

On November 3, 2004, Impax issued a press release announcing a delay in the release of its

4

third-quarter results from November 4 to November 9 "to allow its independent auditors more time

to complete their review of the Company's third quarter financial statements, including the timing of

certain customer credits on bupropion products marketed by a strategic partner."  Complaint, ¶ 104.

Although the Complaint alleges that Impax also announced on this date that it would be restating its

first- and second-quarter results (*id.*, ¶ 110), this is incorrect.  The press release (Ex. Q) nowhere

suggested that any such credits would be accounted for in the third quarter, future quarters, or prior

quarters, much less that results for prior periods would be restated.

Nonetheless, the next day the market price of Impax's stock, which had closed on November

3 at $13, closed down $2.93 at $10.07.  Complaint, ¶ 105.  More than $1 of this decline was

immediately recouped when the stock closed the following day, November 5, at $11.17.  Ex. O.

**E.    Impax's Restatement of its First- and Second-Quarter 2004 Results.**

On November 9, 2004, Impax released its third-quarter results and announced that it was also

restating its first- and second-quarter results.  *Id.*, ¶ 106.  Total revenue for the first quarter was

reduced by $4.3 million, from $38.8 million to $34.5 million.  *Id.*  Total revenue for the second

quarter was reduced by $281,000, from $30.8 million to $30.5 million.  *Id.*  The first quarter of 2004

remained Impax's first-ever profitable quarter.  The second quarter also remained profitable, with no

change to Impax's original earnings per share of $.01.  *Id.*  The Company's press release (Ex. R)

explained that the restatements were based on new information:

> IMPAX also announced that it has determined to restate its financial results for
> the first and second quarters of 2004.  The restatement is required as the result of
> an adjustment *due to recently reported customer credits granted by our strategic
> partner* during March 2004.
>
> . . .
>
> The company is restating its financial statements for the first and second quarters
> as the result of customer credits granted by our strategic partner on sales of the
> Company's bupropion products made by our strategic partner during March 2004.
> *The strategic partner notified the company of the adjustment when reporting sales
> of the Company's products for the quarter ended September 30, 2004.*  Under the
> terms of the Strategic Alliance Agreement, the Company's strategic partner has
> sole and exclusive right to determine all terms and conditions of sale to its
> customers, including pricing, discounts, allowances, price adjustments, returns
> and rebates.  The Company is endeavoring to take steps under the Strategic
> Alliance Agreement to ensure that all such adjustments granted by its strategic
> partner in the future are reported to the Company on a timely basis.  (Emphasis
> added).

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

5

The same day, during a conference call with analysts, Impax's CEO and CFO stated that during the discussions with Teva concerning these credits, Teva also disclosed that its reports did not include any accrual for returned products, and that Impax thus decided to accrue for such returns on its own restated financial statements.  Complaint, ¶¶ 56-57.

The market's favorable reaction to these announcements is telling.  On November 9, the day of the announcement, Impax stock closed at $11.85, up $.60 from the previous day's close of $11.25.  Ex. O.  The day after the announcement, the stock closed up almost another dollar at $12.73.  *Id.*  And on November 11, two days after the announcement, the stock closed at $13.30, which was (1) $.47 above the previous day's close, (2) more than $2 above the closing price ($11.25) on November 8, the day before the announcement, and (3) $ .30 higher than the closing price ($13) on November 3, before the announcement postponing release of third-quarter results.  *Id.*

On November 16 and 17, Impax filed amended SEC Form 10-Qs for the first and second quarters of 2004.  Complaint, ¶ 36.  Exs. D, E.  Consistent with the facts concerning Teva's untimely reporting, the amended first-quarter financial statements explained (Ex. D at 11 (emphasis added)):

> Subsequent to the issuance of its condensed financial statements for the three months ended March 31, 2004, the Company determined that, based on information provided by Teva, its strategic partner, (i) customer credits on sales of bupropion were not recorded in the proper periods, (ii) the sales returns reserve was not properly recorded, and (iii) sales invoices prepared by Teva, were incorrectly prepared.

### F.   Subsequent Events.

Impax has not yet filed its 2004 Form 10-K, or any quarterly reports on Form 10-Q for 2005 due to uncertainty as to the best method for recognizing revenue earned from Teva sales under the SAA.   Complaint, ¶¶ 39, 61.  To facilitate the filing of these reports, on May 26 Impax requested the advice of the Office of the Chief Account of the SEC ("OCA").  Complaint, ¶ 67.  Impax has made clear on several occasions, however, that the issue presented to the OCA concerns the periods in which such revenue should be recognized.  Complaint, ¶ 61; Exs. M, S.  It thus does not concern the issue that led to Impax's November restatement of first- and second-quarter 2004 financial results: Impax's recognition of revenue that was not earned, due to Teva's failure timely to report credits it had given to customers.

**Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

On August 3, 2005, Impax issued a press release concerning its progress in filing its 2004 Form 10-K and 2005 first- and second-quarter 10-Qs.  Complaint, ¶ 61; Ex. S.  The press release also provided estimated results with respect to revenue and net income utilizing three methods that the Company has considered using:  (1) the accounting method Impax used in reporting its results for the first three quarters of 2004; (2) an alternative method proposed to the OCA that would, compared with Impax's current method, result in an increase in revenue for each of the first three quarters of 2004, and a decrease in revenue for each of the succeeding quarters presented; and (3) an alternative method rejected by Impax that would delay recognition until the first quarter of 2005 of all revenue from sales under the SAA during 2004.  Ex. S;  *see also* Complaint, ¶ 110.

With respect to these recent events, the plaintiffs have added new allegations that largely focus on the accounting method that Impax has rejected (*i.e.*, delayed recognition of all 2004 revenue until 2005), alleging that Impax's consideration and rejection of this method somehow demonstrates that Impax was unable to reasonably estimate (and thus properly accrue for) product returns in the first and second quarters of 2004, and thus failed to comply with Statement of Financial Accounting Standard ("FAS") 48 and overstated revenue.  Complaint, ¶¶ 63-67.

As a result of its failure to file its 2004 Form 10-K, Impax received a notice of default with respect to $95 million of its 1.250% Debentures, resulting in the entire outstanding principal and accrued interest becoming immediately due.  In response, Impax completed a private placement of $75 million of 3.50% convertible senior subordinated debentures, using the proceeds to repay the 1.250% debentures.  Complaint, ¶¶ 34, 112; Ex. M.  Also, Impax's common stock was delisted from the NASDAQ market on August 8 due to its failure to file its SEC reports.  Complaint, ¶ 111.

### G.    The Amended Complaint.

Based on the foregoing, and in a futile attempt to add "particularity," the Complaint alleges that a number of documents contained false statements, principally the May 5 and August 4 press releases (*id.*, ¶¶ 88, 95), the first- and second-quarter SEC Form 10-Qs (*id.*, ¶¶ 91-92, 96-97, 100),[4]

---

[4]  The alleged false statements in these documents include Sarbanes-Oxley Act certifications that the company's control procedures are adequate.  Significantly, plaintiffs allege that these certifications were false *because* defendants did not know of the credits given by Teva until after the financial statements were issued.  Complaint, ¶¶ 92(d), 101(d).

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

and several SEC Form S-3 registration statements that incorporated those Form 10-Qs (*id.*, ¶¶ 93-94, 102-03).  All of the "false statements," however, are based on the alleged overstatement of first- and second-quarter revenues.

The Complaint also attempts to create a "strong inference" that the defendants made the alleged false statements with the requisite scienter by throwing a number of disparate and often irrelevant allegations against the wall to see if any stick.  *See, e.g., id.*, ¶¶ 78-87.  Whether considered separately or collectively, the allegations cannot overcome what the Complaint itself and the documents upon which it relies makes clear:  defendants in fact did not know that Impax's first- and second-quarter revenues were overstated until October 2004, when Impax received Teva's reports of third-quarter and September sales of Bupropion.

**Argument**

## I.    Applicable Legal Standards.

### A.    Rules 9(b) and 12(b)(6) and the PSLRA.

A complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure when "it is clear from the face of the complaint and judicially-noticed documents that [plaintiff] cannot prevail as a matter of law."  *Bloom v. Martin*, 865 F. Supp. 1377, 1381 (N.D. Cal. 1994), *aff'd*, 77 F.3d 318 (9th Cir. 1996).  Although well-pleaded facts are accepted as true, "[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss … ."  *Halkin v. VeriFone, Inc. (In re VeriFone Sec. Litig.)*, 11 F.3d 865, 868 (9th Cir. 1993).  Further, a court may disregard allegations contradicted by judicially noticed materials or documents cited or relied upon in the complaint.  *Steckman*, 143 F.3d at 1295-96; *Sogbandi v. Markham*, 2002 WL 31855299 at *1 (N.D. Cal. Dec. 17, 2002); *see also Anderson v. Clow (In re Stac Elecs. Sec. Litig.)*, 89 F.3d 1399, 1405 and n.4 (9th Cir. 1996).

A complaint subject to the PSLRA must also comply with a number of rigorous pleading standards that represent "an unusual deviation from the usually lenient requirements of federal rules pleading."  *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).  Federal Rule of Civil Procedure

**Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

9(b) requires that all allegations of fraud be "stated with particularity."  The PSLRA additionally requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  With respect to each alleged misstatement, the plaintiff must allege specific facts showing that each statement was false when made.  *See Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999).  In addition, the PSLRA requires that the plaintiff plead specific facts establishing a "strong inference" that each defendant acted with scienter, "the nefarious mental state necessary to constitute securities fraud." *DSAM Global Value Fund. v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002); *see also Silicon Graphics*, 183 F.3d at 970; 15 U.S.C. § 78u-4(b)(2).

Finally, for allegations made on information and belief, *e.g.*, allegations based on confidential witnesses ("CWs"), the plaintiff must "state with particularity all facts" upon which each such belief is based.  15 U.S.C. § 78u-4(b)(1); *In re Silicon Graphics Sec. Litig.*, 970 F. Supp. 746, 763 (N.D. Cal. 1997).  If plaintiff fails to state all facts upon which each belief is based, the complaint must be dismissed.  15 U.S.C. § 78u-4(b)(3) (court "shall … dismiss the complaint if the requirements of paragraphs (1) and (2) are not met"); *see also Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1190 (10th Cir. 2003); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 941-42 (E.D. Pa. 1999).

## B.    Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

The elements of a claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, are (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation and (5) economic loss.  *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).

## II.    The Complaint Does Not Allege Facts Giving Rise to an Inference of Scienter.

As noted, the PSLRA requires that a securities fraud plaintiff plead particularized facts giving rise to a strong inference of scienter, or the complaint must be dismissed.  15 U.S.C. §§ 78u-4(b)(2) and (b)(3).  Facts giving rise to "a mere speculative inference . . . or even a reasonable inference" are insufficient to survive a motion to dismiss.  *Silicon Graphics*, 183 F.3d at 985.

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

9

Scienter with respect to a Rule 10b-5 claim consists of deliberately fraudulent conduct, or, at the very least, "deliberate recklessness." *Id.* at 970. "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977.

While the court normally draws reasonable inferences in plaintiff's favor on a motion to dismiss (unless contradicted by documents of which the court may take judicial notice), this is not the case with respect to allegations of scienter. Because the PSLRA requires allegations of specific facts giving rise to a "strong" inference of scienter a court "must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs" to determine "whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

**A.    The Complaint's Allegations Negate an Inference of Scienter.**

The Complaint's allegations of fraud depend on the premise that defendants knew that the first- and second-quarter 2004 financial statements overstated revenue at the time they were issued. As the November 9 press release, the amended Form 10-Qs and the Complaint make clear, however, defendants did not know such revenue was overstated until October, when Teva sent Impax the September and third-quarter reports that included the credits it gave to its customers for March sales.

The Complaint concedes that the errors in Impax's first- and second-quarter financial statements were due to inadequate reporting by Teva, of which defendants did not learn until after the financial statements had been filed. Quoting from Impax's amended Form 10-Qs, the Complaint twice alleges that Impax learned of the customer credits *after* the financial statements were issued. *Id.*, ¶¶ 36, 51. It further quotes a statement from both of Impax's Form 10-Q/As that Impax learned of the credits *from Teva after* the financial statements had been issued and that Impax "is endeavoring to take steps under the [SAA] to ensure that all such adjustments granted by [Teva] in the future are reported to the Company on a timely basis." *Id.*, ¶¶ 92(d), 101(d).

Finally, in one of its "True Facts" sections, the Complaint quotes Impax's CFO as stating during Impax's November 9, 2004 conference call with securities analysts: "The September, 2004, financial report indicated two major sales credits *issued by Teva in September of 2004*, which was

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

10

our share of this credit for an aggregate of about $3.5 million. … As a result of all our discussions with Teva it was determined that these credits are related to March 2004 sales. …" *Id.*, ¶ 90(d).

**B.    Plaintiffs' Other Allegations Concerning Impax's Financial Statements Do Not Raise any Inference of Scienter, Much Less a Strong Inference.**

Implicitly recognizing that the Complaint's allegations and the documents upon which it relies negate any inference of scienter, plaintiffs offer several other allegations concerning Impax's financial statements that are intended to create a strong inference of scienter.  None comes close.

**1.    The Allegations Concerning the Teva Customer Credits.**

Plaintiffs allege that the March credits that Teva reported to Impax for the first time in October could not have been the cause of the restatements because Impax did not restate its reserves for customer discounts, allowances, rebates and credits.  Complaint, ¶¶ 37-39.  Plaintiffs thus allege that defendants lied about the reason for the restatements and therefore, inferentially, must have lied in issuing the original financial statements.  Plaintiffs' allegations are based on the false premise that the restatements would necessarily have directly affected the reserves shown on Impax's financial statements.  Impax's SEC filings and the SAA make clear, however, that customer discounts, allowances, rebates and credits are already deducted from the Bupropion net revenue that Teva reports to Impax, and that Impax thus includes on its financial statements revenue that is net of such credits.  Ex. A at §§ 1.4.26, 11.8; Exs. B at 5; C at 5.  As even the Complaint alleges, Impax's restated financial results reduced its *revenue* for the first and second quarters.  Accordingly, for Impax to have increased its own reserve for Teva's customer credits would have been double counting.  (Impax's own accruals, or reserves, for such items relate to revenue other than that derived from Teva under the SAA, and one would not expect those reserves to increase or decrease merely because Impax received revenue from Teva under the SAA.)[5]

Similarly, the Complaint quotes from Impax's second-quarter Form 10-Q a statement that the decrease in credits was due to "Bupropion Hydrochloride 100 mg and 150 mg Controlled Release

---

[5]  These same filings, properly construed, also render meritless the Complaint's allegations (*e.g.*, ¶¶ 40, 43-45) that Impax falsely represented that its reserves for credits decreased as a result of Teva's sales of Bupropion, when, according to the Complaint, such reserves should have increased.

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

11

1   Tablets, Loratadine and Pseudoephedrine Sulfate (5mg/120mg) 12-hour Extended Release Tablets

2   which are exempt from rebates, chargebacks and other credits as per the agreements with Teva,

3   Schering-Plough, Wyeth, and Novartis."  Complaint, ¶ 98.  It then alleges that this statement was

4   false because the Bupropion products were not exempt from such credits (*id.*, ¶ 98(d)).  Plaintiffs

5   allege (*id.* ¶ 90) that a similar statement in the first-quarter Form 10-Q was false because former

6   CFO Spiegler, in his November 9 statement to securities analysts quoted above, referred to "our

7   share" of the sales credits issued by Teva.  *Id.*, ¶ 90(d).

8       While the phrase "exempt from" might have been an inartful form of expression, insofar as

9   Bupropion revenue is concerned this was but another way of saying that Impax's own reserves for

10  credits are unaffected by credits given by Teva, because Teva's credits are already reflected in the

11  net revenue amounts reported by Teva and recorded by Impax.  Taken in context, CFO Spiegler's

12  November 9 reference to "our share" of the newly discovered Teva credits was merely a colloquial

13  expression of the amount by which Impax's share of the Bupropion revenue was reduced due to the

14  credits that Teva had issued to its customers and belatedly reported to Impax.

15          **2.        The Reserve for Returned Products and the Alleged Violations of GAAP.**

16      The Complaint sets forth a laundry list of purported generally accepted accounting principles

17  that Impax's original first- and second-quarter financial statements allegedly violated, due to an

18  alleged failure to accrue proper reserves for customer returns of Bupropion.  *Id.*, ¶¶ 51-77.[6]

19      "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP,

20  without more, does not establish scienter."  *DSAM*, 288 F.3d at 390 (quoting *In re Software*

21  *Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)); *see also Fisher v. Vantive Corp. (In re Vantive*

22  *Corp. Sec. Litig.)*, 283 F.3d 1079, 1091 (9th Cir. 2002); *Miller v. Pessani (In re Worlds of Wonder*

23  *Sec. Litig.)*, 35 F.3d 1407, 1426 (9th Cir. 1994).  Even allegations suggesting a deliberate violation

24  of GAAP, without more, do not adequately plead fraud.  *See Worlds of Wonder*, 35 F.3d at 1426

25  (citing *Vosgerichian v. Commodore Int'l*, 832 F. Supp. 909, 915 n.8 (E.D. Pa. 1993)).  Nor does an

26  ──────────────

27      [6]  Plaintiffs allege that defendants violated various accounting "principles" contained in
    FASB Statements of Concepts Nos. 1 and 2.  *Id.*, ¶¶ 76(b)-(h).  This is incorrect.  "[A] Statement of
    Financial Accounting Concept does not establish generally accepted accounting principles."  FASB

28  Statement of Concept No. 1, "Highlights" and ¶ 6.

12

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

"obvious failure to follow GAAP" give rise to a strong inference of scienter.  *In re United States Aggregates, Inc.*, 235 F. Supp. 2d 1063, 173 (N.D. Cal. 2002) (citing *DSAM*, 288 F.3d at 391).

To base scienter on GAAP violations, plaintiffs must allege particular facts showing that (1) specific accounting decisions by defendants were improper and (2) defendants knew specific facts at the time that rendered those accounting decisions fraudulent.  *See DSAM*, 288 F.3d at 390-91.  In *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000), for example, the defendants over a number of periods improperly recorded as revenue more than $325 million that was subject to substantial contingencies set forth in "side letter" agreements with customers.  *Id.* Defendants segregated the letter agreements from the principal contracts to hide them from the company's auditors and also destroyed computer files to hide their improper accounting practices. *Id.* Further, the company's internal investigation concluded that defendants had acted intentionally, and subsequent management severely criticized them.  *Id.* at 1272-73.

*McKesson* makes clear that to serve as a basis for inferring scienter, GAAP violations, at a minimum, must be so widespread and significant that one can infer that the defendant had to have known of the violations.  This case is a far cry from *McKesson*.  Impax's restatements resulted, not from substantial and systematic errors repeated over an extended period of time, but from an isolated instance of misreporting by a third party (Teva) that defendants, according to the documents upon which the Complaint relies, promptly reported to its outside auditors and publicly disclosed.

The Complaint nonetheless tries to create an inference by focusing on FAS 48, and the provisions in Emerging Issues Task Force ("EITF") No. 00-21 and SEC Staff Accounting Bulletin ("SAB") 104 that elaborate on or interpret it.  It alleges that these provisions prohibit recognition of revenue from sales that include a right of return until the right expires *unless* the amount of returns can be reasonably estimated (and revenues accordingly reduced for the period of sale).  Complaint ¶¶ 53-75.  According to plaintiffs, Impax violated these provisions by recognizing revenue from Teva's sales of Bupropion when it could not reasonably estimate returns.  None of the "specific facts" alleged in the Complaint, however, create even a reasonable inference, much less the required

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

13

1   "strong inference," that any defendant knew the first- and second-quarter financial statements

2   violated FAS 48 (or any other GAAP provision) when originally issued.

3       **The Failure to Establish a Reserve.**  The Complaint alleges (¶¶ 41, 58) that Impax's

4   controller (who is not a defendant) did not instruct "CW6" (a "confidential witness" purportedly

5   employed in Impax's finance department) to set up a returns reserve for Teva sales.  The conduct of

6   Impax's controller is hardly surprising, however, because, as noted, the SAA required that Teva's

7   reports to Impax of "Net Revenue" account for returns in accordance with GAAP, and defined "Net

8   Revenue" as revenue net of allowance for returns.  Ex. A at §§ 1.4.26, 1.4.33, 11.3.  The only

9   reasonable inference to be drawn from these allegations is that defendants believed that Teva

10  reported revenue net of a reserve for returns, as the SAA required.

11      Other "specific facts" alleged in the Complaint negate any inference that the defendants

12  knew of any GAAP violations when Impax issued its original first- and second-quarter financial

13  statements.  The Complaint twice quotes (¶¶ 92(d), 101(d)) from Impax's amended Form 10-Qs that

14  "[s]ubsequent to the issuance of" those financial statements "the Company determined that, based on

15  information provided by Teva, … the sales returns reserve was not properly recorded, … ."  The

16  Complaint also alleges (¶¶ 56-57) that during the November 9 conference call, Impax's CEO and

17  CFO both explained that the issue with the returns reserve was not that returns could not be

18  reasonably estimated (as the Complaint alleges), but that Teva's reports did not accrue any reserve

19  for returns (as required by the SAA), and that Impax first learned of this in October, when it

20  discussed with Teva the credits that first appeared on Teva's September and third-quarter reports.[7]

21

22

23      [7]  Impax's restated financial statements thus increased Impax's own reserve for credits,
    rebates and returns to account for the returns accrual that Teva's reports did not include.  Impax's

24  first-quarter accrual increased by $789,000, and its second-quarter accrual by $281,000.  Complaint,
    ¶ 30 (chart); *see also id.*, ¶ 37 (chart).  The notes to the financial statements make clear that these

25  changes related to the accrual for returns.  *Compare* Ex. B at 10 with Ex. D at 10 (accrual for returns
    in the original first-quarter financial statements of $1,781,000 versus accrual in the restated financial

26  statements of $2,570,000, reflecting $789,000 increase); Ex. C at 10 with Ex. F at 10 ($2,802,000
    accrual for returns for first six months in original second quarter financial statements versus accrual

27  in the restated financial statements of $3,872,000, reflecting six-month increase of $1,070,000, *i.e.*,
    $789,000 + $281,000).  The restated second-quarter financial statements attribute the increase to

28  "products marketed through Rx Partners, such as Teva … ."  Ex. E at 10.

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Blank Rome LLP*
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

**The August 2005 SEC Form 8-K.**   As noted, on August 3, 2005 Impax filed with the SEC a Form 8-K updating investors on its efforts to file its 2004 Form 10-K and 2005 Form 10-Qs, and discussing its request for the OCA's advice.  The Complaint seizes on one accounting method mentioned in this filing, called the "Deferral Policy," that Impax has considered and rejected.  Under this method, Impax would defer recognition of all revenue related to 2004 sales under the SAA until the first quarter of 2005.  Complaint, ¶¶ 61-67.  According to the Complaint, the Deferral Policy "confirms that Impax could not meet the criteria of FAS 48 … because the amount of rebates, chargebacks, returns and other credits were not reasonably estimated until … March 2005." *Id.*, ¶ 64.  Plaintiffs add that inclusion of the Deferral Policy in Impax's letter to the OCA confirms that the Deferral Policy complies with FAS 48 and that Impax prematurely recognized revenue in the first quarter of 2004. *Id.*, ¶ 67.

That Impax *rejected* the Deferral Policy actually creates an inference that defendants believed, and continue to believe, that such returns could reasonably be estimated, thus negating any inference that defendants knew specific facts in 2004 indicating that recognition of revenue under the SAA was improper.  Similarly the two other methods discussed in the Form 8-K that Impax has *not* rejected both contemplate continued quarterly recognition of revenue earned under the SAA during 2004, and also negate an inference of scienter.

That Impax considered, or even that the OCA may recommend, the Deferral Policy does not establish a knowing violation of GAAP.  Consideration of alternative resolutions to a problem after it has arisen certainly does not create an inference of scienter.  "Much of any business consists of having problems and dealing with them." *Ronconi*, 253 F.3d at 434.  Further, "GAAP is not a set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range of reasonable treatments, leaving the choice among alternatives to management." *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1457 (N.D. Cal. 1996) (citing *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544 (1979)); *cf. Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1549 (9th Cir. 1994) (*en banc*) (the setting of reserves is often based on "flexible accounting concepts, which, when applied, do not always (or perhaps ever) yield a single correct figure").  Thus, even if

15

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

1    its allegations did not affirmatively negate any inference of scienter, the Complaint must allege facts

2    raising a strong inference that Impax's failure to use the Deferral Policy in the first and second

3    quarters of 2004 was more than a mere difference of opinion as to the most appropriate time to

4    recognize revenues generated by Teva's sales.  *GlenFed*, 42 F.3d at 1549; *In re Oak Tech. Sec.*

5    *Litig.*, 1997 WL 448168 at *9 (N.D. Cal. Aug. 1, 1997); *Cirrus Logic*, 946 F. Supp. at 1457;

6    *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734 at *4-*5 (N.D. Cal. June 8, 1994).  The

7    Complaint does not do so.

8        **The "Terms and Conditions" Allegations.**    The Complaint also alleges that, given Teva's

9    exclusive contractual right to control the terms and conditions of sales to its (Teva's) customers,

10    including credits and rebates, Impax had an obligation to learn of such terms and conditions, but

11    failed to do so, thus violating GAAP.  Complaint, ¶ 53.  This overlooks the indisputable fact that the

12    SAA required Teva to provide Impax with reports showing sales net of reserves for returns (among

13    other things), computed and reported to Impax according to GAAP.  Plaintiffs do not allege, and it is

14    hard to fathom any reason why, Impax should have assumed or believed, much less known, that

15    Teva—an international, multi-billion dollar pharmaceutical company—had not included an accrual

16    for returns in its reports to Impax.  Nor are there any allegations suggesting why Impax could not

17    rely on Teva's reports as including such a reserve, given the SAA's requirements.

18        **The Restatements.**    Relying on Accounting Principles Board Opinion No. 20 ("APB 20"),

19    the Complaint alleges that Impax's restatement of its financial results is an admission that its

20    originally issued financial statements were false and misleading.  Complaint, ¶ 35.  As noted, the

21    mere publication of inaccurate accounting figures does not establish scienter.  *DSAM*, 288 F.3d at

22    390.  Further, a number of courts have held that a company's restatement of financial results does

23    not alone raise an inference of scienter.  *In re Network Assoc., Inc. II  Sec. Litig.*, 2003 WL

24    24051280 at *14 (N.D. Cal. March 25, 2003); *United States Aggregates*, 235 F. Supp. 2d at 1073;

25    *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d  549, 565 (S.D.N.Y. 2004); *In re Sun*

26    *Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1297 (D.N.M 2002); *In re Segue Software,*

27    *Inc. Sec. Litig.*, 106 F. Supp. 2d 161 (D. Mass. 2000).  As one court recently explained, a restatement

28

16

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

1    is only evidence that one or more categories of a company's finances were inaccurate, not that the

2    cause of the inaccuracy was fraud.  *Davis v. SPSS, Inc.*, 2005 WL 1126550 at *18 (N.D. Ill. May 10,

3    2005).  The Complaint's reliance on the restatements is nothing more than "fraud by hindsight" and

4    is insufficient to establish scienter.  *In re FVC.com*, 2002 WL 465161 at *2 (9th Cir. March 15,

5    2002).

6         Impax's compliance with APB 20 actually negates any inference of scienter.  As the

7    Complaint acknowledges (¶ 35), APB 20 allows for the restatement of financial results when, among

8    other things, there was "an oversight … of facts that existed at the time the financial statement was

9    prepared."  *In re Metawave Communs. Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1079 (W.D. Wash.

10   2003) (citing APB 20, ¶ 13).  Thus GAAP itself recognizes that mistakes can be made in financial

11   reporting and provides guidance in dealing with them.  Impax's compliance with APB 20 by

12   promptly correcting the mistakes raises an inference that defendants did *not* act fraudulently or with

13   "deliberate recklessness."

14        In this regard, this case is strikingly similar to *In re Segue Software, Inc. Sec. Litig.*, *supra*.

15   As here, the complaint in that case alleged that the defendants violated FAS 48 by failing to accrue a

16   correct amount for product returns, and accordingly had to restate its financial results for two

17   quarters.  The court held that "[w]hile what in hindsight proved to be an underestimate of returns and

18   correspondingly insufficient allowance for income reversals forced Segue to restate its 1998

19   operating results … a restatement of earnings, without more, does not support a 'strong inference' of

20   fraud, or for that matter a weak one."  106 F. Suup. 2d at 169.  The court explained in terms equally

21   applicable here:

22        To reflexively punish a company for correcting its earnings statements when
          subsequent events disclose errors in the original would create a perverse incentive for
23        management to conceal mistakes, thereby defeating a core purpose of the securities
          laws.  Here, the candid and prompt manner in which [ ] management responded to the
24        reversal of revenues negates rather than supports any inference of scienter.

25   *Id.* at 170.

26

27

28

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**Blank Rome LLP**

**Watergate  600 New Hampshire Ave., NW  Washington, DC 20037**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.      Plaintiffs' Other Scienter Allegations Fail to Create any Inference of Scienter, Much Less a Strong Inference.**

Perhaps recognizing that the Complaint's allegations concerning GAAP violations fail to raise any inference of scienter, plaintiffs make several additional allegations intended to create the statutorily required "strong inference" of scienter.  None makes the grade.

**1.      Allegations Regarding Excess Inventory.**

The Complaint contains scattered allegations (¶¶ 29, 74, 107-08) regarding Impax's supposed "excessive inventory" of Bupropion.  It is hard to determine the purpose of these allegations, as the Complaint nowhere alleges that defendants made any representation concerning inventories or, indeed, any representation to which inventories might be relevant.  There are no allegations as to what Impax's inventories of Bupropion were at any given time, what amount of inventory was reasonable or prudent, the amount by which inventories increased over time, or the amount by which inventories were "excessive."  Even with respect to inventories, plaintiffs must plead specific figures that support their allegations.  *See Kane v. Madge Networks N.V.*, 2000 WL 33208116 at *6 (N.D. Cal. May 26, 2000), *aff'd*, 32 Fed. Appx. 905 (9th Cir. 2002).

Further, the Complaint never ties the alleged excess inventory to first- and second-quarter revenue, or what defendants knew when Impax issued its financial statements for these periods.  To the contrary, it alleges that "[b]y November 2004, Impax had built up excessive inventory." Complaint, ¶¶ 29, 107.  By no stretch of the imagination could excessive inventories in the middle of the fourth quarter have any affect on reported revenue for the first two quarters.

Moreover, the allegations regarding inventory rely exclusively on information provided by two "confidential witnesses," dubbed CW1 and CW3.  *Id.*, ¶¶ 80(e), 98-99.  Confidential sources can be used to support allegations only if the complaint (1) describes the source "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" and (2) contains "adequate corroborating details."  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004); *see also In re CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1082-84 (N.D. Cal. 2005).

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Blank Rome LLP

Watergate 600 New Hampshire Ave, NW Washington, DC 20037

1    Here, the Complaint contains no corroborating details concerning Impax's Bupropion

2  inventories.  Further, its descriptions of CW1 and CW3 provide no basis to believe they had access

3  to information concerning whether inventories were "excessive."  CW3 was merely a production

4  technician, *i.e.*, a production line worker, who apparently did not even work for Impax during the

5  class period.  Complaint, ¶¶ 79, 88(e).  CW1 is described as a "quality assurance inspector …

6  responsible for tracking product inventory, testing and verifying product quality as well as

7  interacting with production employees."  *Id.*, ¶ 88(e).  How someone concerned with product quality

8  would be in a position to know what level of inventory was prudent is nowhere explained.  And

9  clearly, neither CW1 nor CW3 had access to information concerning how any alleged "excessive

10  inventories" affected Impax's reporting of first- and second-quarter revenues.  *See Kuebeck v.*

11  *Genesis Microchip, Inc.*, 2005 WL 1787426 at * 6 (N.D. Cal. July 27, 2005) (confidential witness's

12  position as a field application engineer may have given him access to information about engineering

13  costs, but not to information as to how company reported such costs on financial statement).

14           **2.       The Individual Defendants' Status in the Company.**

15    Plaintiffs also allege that defendants were heavily involved in the "day-to-day details of

16  managing the Company" and that certain defendants held quarterly meetings at which the previous

17  quarter's financial results were discussed.  Complaint ¶¶ 78-79, 132.  The Court has rejected such

18  allegations of "day-to-day" involvement as a basis for inferring scienter, even where the defendant

19  allegedly had access to internal weekly reports.  *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833,

20  843-44 (N.D. Cal. 2000).[8]  As the Court correctly observed, if allegations of "hands-on" or "day-to-

21  day" management were sufficient to raise an inference of scienter, then "any corporate officer could

22  be said to possess the requisite knowledge by virtue of his or her positions."  *Id.* at 844.

23    Specifically, plaintiffs cannot save their case on this basis here.  The Complaint alleges no

24  facts to raise any inference that, as a result of defendants' alleged involvement, they knew or had

25

26        [8]  The Complaint's allegations (¶ 90(e)) that defendants Spiegler and Doll had access to
certain Impax daily reports raises no inference of scienter.  As the Complaint makes clear, the
revenues reflected on these reports for sales by Teva reflected only manufacturing costs and were

27  always inaccurate.  *Id.*  The Complaint premises such alleged knowledge, not on sales by Teva, but
on "sales to Teva" reflected on these reports—sales that necessarily did not include the revenue

28  generated by Teva's sales to its customers or any credits that Teva might have given.

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**Blank Rome LLP**

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

1   reason to know that Teva's first- and second-quarter reports to Impax failed to report customer

2   credits given by Teva, did not comply with GAAP, or were not otherwise accurate.  Nor are there

3   any allegations that the financial results that any defendant presented at the quarterly meetings

4   differed from the results that Impax publicly reported in its Form 10-Qs.  *See, e.g., In re Peerless*

5   *Sys. Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 994 (S.D. Cal. 2002) (plaintiff fails to plead scienter

6   absent particular allegations raising an inference that defendants knew true and adverse information).

7   In short, from such allegations, one "cannot determine whether there is any basis for alleging

8   that the officers knew that their statements were false at the time they were made—a required

9   element in pleading fraud."  *Silicon Graphics*, 183 F.3d at 985; *see also Vantive*, 283 F.3d at 1079.[9]

10   **3.      The Defendants' Stock Sales.**

11   The Complaint alleges (¶¶ 81-83) that defendants sold Impax stock after Impax announced

12   its first-quarter 2004 results and filed its related Form 10-Q.  It includes a chart (¶ 83) listing the

13   amount of stock each defendant sold, and the "% of Shares Actually Owned and Sold During the

14   Class Period," and concludes that they sold between 12% and 100% percent of their stock.

15   Stock sales by insiders raise an inference of scienter "only when it is 'dramatically out of line

16   with prior trading practices at times calculated to maximize the personal benefit from undisclosed

17   inside information.'"  *Silicon Graphics*, 183 F.3d at 986 (quoting *In re Apple Computer Sec. Litig.*,

18   886 F.2d 1109, 1117 (9th Cir. 1989)).  Courts thus consider:  "(1) the amount and percentage of

19   shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the

20   insider's prior trading history."  *Silicon Graphics*, 183 F.3d at 986.

21   **The Amount Sold**.  The allegations that the defendants sold an exceedingly large percentage

22   of their stock is based on a comparison of the number of shares each sold with the number of "shares

23   actually owned."  This is an incorrect measure.  It is well established that

24   "[a]ctual stock shares plus exercisable stock options represent the owner's trading
     potential more accurately than the stock shares alone.  Therefore, a sale involving a
25   significant portion of an insider's actual shares, but only a small portion of his shares
     and options combined, is less suspicious than were the insider to hold no options."

26   ───────────────

27   [9]   The Complaint alleges (¶ 75) that  "the only reasonable inference" to be drawn from CFO
     Spiegler's December 2004 *resignation* from Impax is that he knew Impax's financial statements
     violated GAAP.  The Court, however, has rejected inferring scienter from the resignation of a
28   corporate officer.  *See United States Aggregates*, 235 F. Supp. 2d at 1073-74.

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Silicon Graphics*, 183 F.3d at 986-87; *see also Ronconi*, 253 F.3d at 435; *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1164 (C.D. Cal. 2004).

When exercisable options are considered with the "shares actually owned," the percentage of shares sold by the defendants ranges from 0 to 46% as the following chart demonstrates:[10]

| Name | Shares Owned | Exercisable Options Owned | Total shares and options owned | Shares Sold | Shares Sold as a percentage of shares and exercisable options owned |
|---|---|---|---|---|---|
| D. Doll | 32,279 | 49,500 | 81,779 | 30,000 | 36% |
| B. Edwards | 121,901 | 500,000 | 621,901 | 120,000 | 19% |
| D. Edwards | 23,200 | 11,505 | 34,705 | 0 | 0% |
| C. Hsiao | 4,134,655 | 438,810 | 4,573,465 | 600,000 | 13% |
| L. Hsu | 2,650,012 | 432,330 | 3,082,342 | 600,000 | 19% |
| C. Spiegler | 66,750 | 54,250 | 121,000 | 56,000 | 46% |

As a group, the defendants sold only 16.5% of their total holdings. Considered collectively, there is nothing suspicious about this low percentage. *See In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1038 (N.D. Cal. 2000), *aff'd*, 32 Fed. Appx. 338, 341-42 (9th Cir. 2002) (finding that the collective sale of 13.3% of the defendants' stock was not suspicious).[11]

Nor do any individual's sales raise an inference of scienter. *Ronconi*, 253 F.3d at 435 (sales of 10 and 17 percent by CEO and CFO are not suspicious). The only sales that might possibly raise an eyebrow are those of defendants Spiegler and Doll, who sold, respectively, 46% and 36% of their available holdings. Even these amounts are not suspicious, however. First, they owned significantly less stock and exercisable options than the other individuals. *See FVC.com*, 136 F. Supp. 2d at 1039

---

[10] These amounts are derived from Form 4s and Schedule 13Ds filed with the SEC. *See* Exs. G, H, I, J, K, L. Because plaintiffs could not have included information regarding the defendants' stock sales without these SEC-filed documents, the Court may take judicial notice of them.

[11] Although the Complaint alleges that D. Edwards sold 97,248 shares, this is misleading. The sales were actually by WD Partnerships LP and WD Offshore Fund Ltd. Ex. J. These are investment funds managed by Windcrest Discovery Investments LLC, of which D. Edwards is a managing member. D. Edwards has an investment in the funds as a general member, and receives a "carried interest" in the profits of the funds. According to Impax's February 2004 proxy statement, D. Edwards personally owned 34,705 shares and exercisable options. None were sold.

21

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

1   (insider's sale of 92% of his holdings fails to raise inference of scienter because he owned far less

2   than other defendants).  Moreover, Spiegler's sales represented only 4% of the shares sold by all

3   defendants, while Doll's represented only 2%.  *Silicon Graphics*, 183 F.3d at 987 (insider's sale of

4   43.6% of his holdings not suspicious because it was only 5% of total insider sales).

5         **Timing of Sales**.  The Complaint's allegation (¶ 82) that defendants' stock sales occurred at

6   a time when the defendants "knew" the share price was inflated and would decline once the true

7   "concealed" facts became public is the type of general non-specific allegation that fails to give rise

8   to any inference of scienter, much less a strong one.  It is directly contrary to the allegations and

9   documents showing that defendants did not have such knowledge at the time of their stock sales.

10        Although not entirely clear, the Complaint could be construed as alleging that the timing of

11  the defendants' stock sales give rise to an inference of scienter because the sales occurred only a

12  month after Impax announced its first-quarter results.  Such an allegation does not give rise to an

13  inference of scienter.  In *FVC.com.*, *supra*, plaintiffs alleged that stock sales that occurred after

14  issuance of a press release announcing the company's most profitable quarter ever gave rise to an

15  inference of deliberate recklessness because the company subsequently revised the financial

16  statements to reduce revenue by $7,000,000, resulting in a 60% decline in the stock's price.  The

17  court rejected the allegation, explaining that

18        [t]he Complaint lacks any factual allegations [ ] that suggest that such timing is
          suspicious.  One would expect shareholders of a company which only recently
19        went public to sell significant sums of stock shortly after the company
          announced its most profitable quarter in history.  Indeed, if, as the plaintiffs contend,
20        defendants knew in January that the fourth quarter financials were false, one
          would expect that defendants would have continued to sell their stock into March
21        as it became apparent that they were going to have to announce that [the
          company] had actually posted a loss for the fourth quarter.  Yet, the Complaint
22        does not allege that any of the defendants made any significant sales in March or
          early April.

23  *FVC.com*, 136 F. Supp 2d at 1040.

24        The Ninth Circuit recently relied on the Court's *FVC.com* decision in rejecting an argument

25  almost identical to the one made here, namely, that an insider's sale of stock after announcement of

26  positive quarterly financial results gives rise to an inference of scienter:

27        Officers of publicly traded companies commonly make stock transactions
          following the public release of quarterly earnings and related financial
28        disclosures.  That [defendant] would sell an extremely small portion of his total

22

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

Blank Rome LLP

Watergate 600 New Hampshire Ave., NW Washington, DC 20037

holdings following the positive announcement of [his company's] year-end and fourth quarter earnings does not support an inference that [defendant] knew or should have known that the optimistic reports of … projected growth were false.

*Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002). Here, the defendants' sales one month after the announcement of Impax's first profitable quarter—a quarter that remained very profitable even after the restatement (Complaint, ¶ 106)—does not raise any inference of scienter.

**Prior Trading Patterns**. As the Complaint contains no allegations concerning the defendants' prior trading patterns, there is no basis for an inference of scienter. *See Vantive*, 283 F.3d at 1095 (courts "reluctant to attribute significance to … stock sales" absent meaningful prior trading history for comparison).

### 4. Impax not First to Market.

The Complaint alleges that a competitor of Impax, Eon Labs, Inc., was "first to market" with its Bupropion products, having received FDA approval for its 100 mg Bupropion product in November 2003, and that Eon thus had a significant marketing head start that caused Impax to miss its sales expectations. *See, e.g.,* Complaint, ¶¶ 27, 29. Like the "excessive inventory" allegations, the purpose of these allegations is hard to discern. The Complaint does not explain how Eon's status afforded defendants any knowledge as to the credits that Teva gave customers but belatedly reported to Impax. Moreover, to be misleading, an omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The allegations concerning Eon are wide of the mark for several reasons.

First, although the FDA approved Eon's 100 mg product in November, a federal court enjoined Eon from marketing this product until January 14, 2004 and it thus began selling it only two weeks before Impax received FDA approval for its 100 mg product. Ex. U, V, W; *see also* Complaint, ¶¶ 27, 88(e). Eon thus did not have a three- or six-month marketing head start on this product, as the Complaint implies (¶ 27). And as the Complaint acknowledges (¶ 28), Impax and Eon received FDA approval for Bupropion 150 mg the same day, March 22, 2004. Eon thus had no head start with respect to the 150 mg product.

23

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

1    Second, the Complaint nowhere alleges that defendants ever represented that Impax was the

2    first to market Bupropion products, so that the omission of a disclosure concerning Eon's status

3    could not have been misleading.  Nor do plaintiffs allege that Impax had an obligation to disclose

4    Eon's status, which was well known to the market, as the FDA publishes all its drug approvals on its

5    website.[12]  "[T]here can be no liability under the securities laws because of an alleged failure to

6    disclose information that is already available to the public."  *Haney v. Pacific Telesis Group*, 2000

7    WL 33400194 at *10 (C.D. Cal. Sept. 19, 2000) (quoting *Berkowitz v. Conrail, Inc.*, 1997 WL

8    611606 (Sept. 25, 1997 E.D. Pa.)); *see also Apple Computer*, 886 F.2d at 1115.

9    Finally, the Complaint does not allege that Impax ever made representations of internal sales

10   projections of Bupropion to the public.  Nor does it allege what Impax's internal projections for

11   Bupropion were for any given period, or the amount by which Impax failed to meet those

12   projections.

13   In short, the "first-to-market" allegations and those concerning Impax's failure to meet sales

14   expectations are, at best, too vague and, even if made with particularity, would not in any event give

15   rise even to a reasonable inference of scienter, much less the required "strong inference."

16                    **5.      Executive Compensation.**

17   Plaintiffs allege that the defendants had the motive and opportunity to commit fraud based on

18   their compensation packages.  Complaint, ¶¶ 84-87.  Whether couched in terms of "motive and

19   opportunity" or otherwise, it is well established that allegations that corporate officers were

20   motivated by compensation plans to do such things as make the company appear profitable or keep

21   stock prices high fail to give rise to an inference of scienter because such legitimate motives are

22   shared by virtually all corporations and their officers.  *See Lipton*, 284 F.3d at 1038; *Vantive*, 283

23   F.3d at 1097; *see also Cornerstone Propane*, 355 F. Supp. 2d at 1091; *In re Calpine Corp. Sec.

24   Litig.*, 288 F. Supp. 2d 1054, 1087 (N.D. Cal. 2003); *McKesson HBOC*, 126 F. Supp. 2d at 1274

25   n.14; *Berger v. Ludwick*, 2000 WL 1262646 at *10 (N.D. Cal.  Aug. 17, 2000); *aff'd*, 15 Fed. Appx.

26

27        [12]  http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label
     ApprovalHistory#apphist.

28

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

528 (9th Cir. 2001); *Florida State Bd. of Admin. v. Bay Networks, Inc.*, 1998 WL 34187566 at *3 (N.D. Cal. Sept. 15, 1998).  Here, the "incentive compensation" allegations are especially misguided because Impax promptly restated its financial results, eliminating the alleged "overstated revenue" upon which any extra "incentive compensation" presumably would have been based.

> **D.     The Totality of the Allegations Fail to Raise any Inference of Scienter, Much Less a Strong Inference.**

Where the Complaint's allegations, considered individually, do not raise a strong inference of scienter, the Court may consider whether the allegations in the aggregate give rise to a strong inference.  *In re Daou Systems, Inc. Sec. Litig.*, 2005 WL 1431833 at *11 (9th Cir. June 21, 2005). In so doing, however, the Court again considers "*all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Id.* (quoting *Gompper*, 298 F.3d at 897) (emphasis in original).  In *Daou*, for example, the Court found that plaintiffs raised a strong inference of scienter because they alleged with particularity, based on numerous confidential witness statements, that the defendants had a hands-on management style, personally directed the fraudulent accounting practices and improper revenue recognition, overstated the companies' revenue over seven consecutive quarters, pervasively failed to comply with specific GAAP provisions, used the company's stock as consideration for the company's acquisition of 11 different companies, and engaged in suspicious insider trading involving the vast majority of their shares.[13]  Here, the allegations taken together pale by comparison.

The Complaint's allegations, and the documents upon which it relies, negate any inference of scienter.  They establish that defendants did *not* know about the credits that Teva had given to its (Teva's) customers for March 2004 sales—the factor that led to the restatement—until October 2004, when Teva belatedly reported the credits in its September and third-quarter sales reports.  Nor

---

[13]  For example, the complaint alleged that Daou, a creator and installer of computer network systems which recognized revenue on the percentage-of-completion method, automatically recorded, without regard to actual or estimated costs incurred, 20% of the contract price upon contract signing, 40% after ordering the equipment to be installed, and the balance immediately after the equipment was configured and tested.  It further alleged that on one significant contract, defendants directed employees to log on to their computers and bill eight hours, even though there was no work to do, and no work was performed.

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

did Impax know that Teva was not accruing a reserve for returns.  Teva was contractually obligated to report its sales, net of all such reserves and credits, on a timely basis and in accordance with GAAP.  Plaintiffs plead no fact suggesting that defendants knew, had reason to believe, or even should have suspected, that Teva had not complied with this contractual obligation.

Moreover, unlike the significant, systematic and pervasive GAAP violations in *Daou*, Teva's late-reported customer credits were essentially a one-time event that defendants promptly corrected.  After the restatements, the first quarter remained Impax's first profitable quarter—and a very good quarter, at that—while second-quarter revenue changed by a fraction of a percent, with no change in earnings per share.

The Complaint's other allegations collectively fail to raise even a reasonable inference of scienter.  Neither the amount nor the timing of defendants' stock sales is suspicious.  The same is true with respect to the notion that defendants inflated revenue because their compensation was tied to financial results.  The compensation of virtually every executive of a public company is so tied. Further, the fact that defendants promptly restated the first- and second-quarter results, and that any compensation would thus be based on the restated results, raises an inference that compensation was not a factor in the original reporting of first- and second-quarter revenue.  In short, plaintiffs' other allegations are a collection of circumstances that apply to virtually every corporation in America.

Finally, the allegations concerning Eon being first to market with Bupropion are largely incorrect and, like the "excessive inventory" allegations, not even remotely related to whether the defendants knew about the credits issued by Teva or Teva's failure to include an accrual for returns in its reports.

## III.   The Complaint Fails to Allege Loss Causation.

To state a Rule 10b-5 claim, a plaintiff must plead and prove "loss causation," that is, "a causal connection between the material misrepresentation and the loss."  *Dura Pharm.*, 125 S. Ct. at 1631.  General allegations that a stock's price was inflated by a misrepresentation are inadequate because an "'artificially inflated purchase price' is not itself a relevant economic loss."  *Dura*

**Blank Rome LLP**

Watergate  600 New Hampshire Ave, NW  Washington, DC 20037

26

*Pharm.*, 125 S. Ct. at 1634 (internal citations omitted).[14]  The Complaint here does not allege loss causation.  Nor can plaintiffs possibly do so.

The Complaint attempts to meet the applicable standard by relying on the decline in Impax's stock price between November 3 and 4, 2004.  The Complaint picks these dates because Impax made a public announcement on November 3 and Impax's stock's price dropped the next day.  But loss causation requires a causal connection between the alleged *misrepresentation* and the alleged loss.  Thus, in holding the allegations of loss causation insufficient in *Dura*, the Supreme Court specifically noted the plaintiffs' failure in that case "to claim that Dura's stock price fell significantly *after the truth became known*."  *Dura Pharm.*, 125 S. Ct. at 1634 (emphasis added).

Accordingly, to allege loss causation the Complaint must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005); a*ccord, Daou Systems*, 2005 WL 1431833 at *15-16 (finding loss causation to be adequately pleaded where defendants misrepresented company's financial condition and plaintiffs alleged specific declines in stock price on specific dates where truth about financial condition was publicly disclosed); *Zelman v. JDS Uniphase Corp.*, 2005 WL 1649042 at *14 (N.D. Cal. July 13, 2005) (same).  Further, "a plaintiff must allege … that the *subject* of the fraudulent statement or omission was the cause of the actual loss."  *Lentell*, 396 F.3d at 173 (quoting *Suez Equity Investors, LP v. Toronto Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)) (emphasis in original).

It is thus the *content* of the November 3 press release, not just its issuance, that is critical to the loss-causation analysis here.  All that the November 3 announcement disclosed was that Impax was postponing its third-quarter conference call for five days to allow the company's "independent auditors more time to complete their review of the Company's third-quarter financial statements, including the timing of certain customer credits on bupropion products marketed by a strategic

---

[14]  The Complaint makes clear that lead plaintiff Pension Plan has suffered no damages at all. It bought *and sold* its Impax stock during the Class Period.  Complaint, ¶ 8 and Certification attached thereto.  As the Supreme Court explained, in such circumstances "the misrepresentation will not have led to any loss."  *Dura Pharm.*, 125 S. Ct. at 1631.

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

partner." Ex. Q.  It did not disclose any "truth" about Impax's first- and second-quarter financial statements or revenues for those periods.  For all that investors knew, the customer credits were given in the third quarter for sales in that quarter, or even future quarters.  As in *Dura*, the causal link, *i.e.*, a public disclosure of the truth, is missing from the November 3 announcement.

Moreover, no putative class member can allege loss causation here because there simply was no loss caused by any alleged misrepresentation.  The "truth" as to Impax's first- and second-quarter results was first announced on November 9.  On that day, after the announcement, Impax stock closed *up* $.60, at $11.85.  Ex. R.  The next day it was *up* almost another dollar, closing at $12.73.  Ex. O.  And only two days after the announcement, it closed *up* another $.57 at $13.30, a price that was $.30 higher than the closing price immediately preceding the November 3 announcement.  *Id.*  Plaintiffs therefore cannot allege that any misrepresentation as to first- and second-quarter revenues caused any economic loss to purchasers of Impax stock during the Class Period.

The Amended Complaint attempts to overcome this fatal defect by adding allegations concerning another company, Andrx Corporation.  Andrx had a licensing agreement with Teva and Impax by which Andrx relinquished its rights to the 180-day market-exclusivity period for Bupropion 150 mg in exchange for a share of the profits generated by Teva's sales of that product during that period.  Complaint, ¶ 126.  The Complaint alleges that on November 3—the same day that Impax postponed the release of third-quarter results—Andrx stated in its third quarter Form 10-Q that "sales generated through [this agreement] were 'significantly impacted by shelf-stock adjustments granted by Teva for generic Wellbutrin SR 150mg" and also issued a press release stating that "Anrdx's share of customer credits equaled an approximate $9 million decrease in revenues and operating income."  *Id.*, ¶ 127.  The Complaint alleges that this information, coupled with Impax's postponement of its quarterly conference call, caused Impax's stock price to decline.  *Id.*

As with much of the Complaint, the documents upon which plaintiffs rely do not quite match the allegations.  Neither Andrx's Form 10-Q nor its press release used the term "credits," mentioned returns, or referred to first- and second- quarter financial results.  Rather, Andrx made clear that its

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

28

Blank Rome LLP

Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

1   *third-quarter* revenues were affected: "Such sales [of Bupropion 150 mg] generated licensing

2   revenues to us of $4.9 million in the 2004 Quarter, and were significantly impacted by shelf-stock

3   adjustments granted by Teva for generic Wellbutrin SR 150mg."  Ex. N at 30; *see also id.* at 27

4   (defining the term "2004 Quarter" as the third quarter of 2004).  The press release was even more

5   clear, stating that "[o]n a sequential basis, our results this [*i.e.* the third] quarter include an

6   approximate $9 million decrease in revenues and operating income from our arrangement with Teva

7   and Impax for their generic Wellbutrin SR."  Ex. T.

8          Thus, even extrapolating Andrx's statements concerning its own results to Impax does not

9   suffice to plead loss causation.  Plaintiffs must causally connect the alleged misrepresentations, *i.e.*,

10  the statements made in May and August about first- and second-quarter results, with an actual

11  economic loss, *i.e.*, a decline in Impax's stock price when the truth was disclosed.  Andrx's

12  statements did not disclose any "truth" about Impax's first- and second-quarter financial results.  At

13  most, Andrx's "sequential … $9 million decrease in revenues and operating income" for the third

14  quarter suggested that Impax's *third quarter* results might be disappointing.  By no stretch of the

15  imagination could one interpret Andrx's statements to suggest that Impax's first- and second-quarter

16  financial statements were incorrect, or that Impax was going to restate them.  As in *Dura*, the causal

17  link, *i.e.*, a public disclosure of the truth, is missing from Andrx's (and Impax's) November 3

18  statements.  And the fact remains that when the truth about Impax's first- and second-quarter results

19  *was* actually disclosed, Impax's stock price immediately rose, and shortly thereafter surpassed its

20  November 3 closing price.

21  **IV.     The Complaint Fails to State a Claim for Control Person Liability.**

22          Because plaintiffs do not allege a primary violation of § 10(b), their control person claim

23  under Exchange Act § 20(a) must also be dismissed.  *See, e.g., CornerStone*, 355 F. Supp. 2d at

24  1094; *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002).

25

26

27

28

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**Conclusion**

For the foregoing reasons, the Court should grant defendants' motion to dismiss and dismiss this action with prejudice.

Respectfully submitted,

Dated: October 7, 2005                    BLANK ROME LLP

BINGHAM MCCUTCHEN LLP


    /s/ Michael Joseph

MICHAEL JOSEPH (pro hac vice)

*Attorneys for Defendants*

NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037