United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NO. C 04-04802 JW

In re Impax Laboratories, Inc.
Securities Litigation

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED
COMPLAINT WITH LEAVE TO
AMEND**

_____/

## I.  INTRODUCTION

This is a securities fraud class action suit brought on behalf of investors who acquired Impax Laboratories, Inc. ("Impax") securities between May 5, 2004 and November 3, 2004 (the "Class Period") against Impax and certain of Impax's senior officers and directors (collectively, "Defendants").  Impax is a specialty pharmaceutical company that develops, sells, and markets generic pharmaceuticals, including generic equivalents of drugs Wellbutrin and Zyban.  Plaintiffs allege violations of Sections 10(b) and 20(a) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act").  Before the Court is Defendants' Motion to Dismiss the Second Amended Consolidated Complaint.  The Court conducted a hearing on November 8, 2006.  Based upon the papers submitted to date and the oral arguments of counsel, the Court GRANTS Defendants' Motion to Dismiss with leave to amend.

## II. BACKGROUND

Plaintiffs filed this suit on behalf of all persons who purchased Impax securities during the Class Period.  Plaintiffs allege the following:

Plaintiffs purchased Impax securities during the Class Period and suffered losses as a result of Defendants' actions.  (Second Amended Consolidated Complaint for Violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ¶¶ 12-13, hereafter, "SAC," Docket Item No. 83.)  Defendant Impax is a pharmaceutical company that develops, sells, and markets generic pharmaceuticals, including variations of bupropion hydrochloride ("bupropion"), the generic version of Wellbutrin and Zyban.  (SAC ¶ 2.)  Individual Defendants Barry R. Edwards, Dr. Charles Hsiao, Dr. Larry Hsu, Cornel C. Spiegler, David S. Doll, and David J. Edwards were directors, officers, or high-ranking employees of Impax during the Class Period.  (SAC ¶¶ 15-20.)

Non-party Teva Pharmaceuticals Industries, Ltd. ("Teva") is a global pharmaceutical company that specializes in the production of generic versions of branded pharmaceuticals. Teva entered into a Strategic Alliance Agreement ("SAA") with Impax in June 2001.  The SAA granted Teva exclusive U.S. prescription-marketing rights for six Impax products, including Wellbutrin and Zyban generics, and provided for the two companies to share profits.  (SAC ¶¶ 39-41.)  Non-party Andrx Corporation ("Andrx") was also a signatory to the SAA.  (SAC ¶ 6.)

On May 5, 2004, Impax announced its first profitable quarter, 1Q04.  (SAC ¶ 51.)  In response, Impax stock increased $3.70 on a trading volume of almost 3.7 million shares. (SAC ¶ 2.)  The increase was primarily due to sales of bupropion products.  Id.  On August 4, 2004, Impax announced a second profitable quarter, 2Q04.  (SAC ¶ 4.)  On November 3, 2004, Impax announced a delay in the release of 3Q04 financial results in order for it to review customer credits on bupropion products.  (SAC ¶ 63.)  Also on November 3, Andrx announced that customer credits granted by Teva would result in a $9 million decrease in

2

Andrx revenues and operating income. (SAC ¶ 6.)  These two announcements caused Impax's share price to fall from $13.00 to $10.07, a one-day decline of 23 percent on a trading volume of 6.77 million shares.  Id.  On November 9, 2004, Impax announced that it was restating its financial results for 1Q04 and 2Q04 due to adjustments made as a result of March 2004 customer credits granted by Teva on sale of Impax bupropion products.  (SAC ¶ 7.)  Impax simultaneously announced positive news regarding the FDA's approval of two new drug applications and the submission of a new drug application for the generic version of Concerta.  Id.  Impax's stock increased to $13.30 on November 11, 2004.  Id.

Plaintiffs' Second Amended Complaint alleges two causes of action against Impax: (1) Claim 1, for violation of Section 10(b) of the Exchange Act and Rule 10b-5, by issuing false or misleading statements about Impax's reserves, revenues, and income, and (2) Claim 2, for violation of Section 20(a) of the Exchange Act, for control person liability.  Presently before the Court is Defendants' Motion to Dismiss pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rules of Civil Procedure 9(b) and 12(b)(6).[1]  Defendants contend that Plaintiffs have failed adequately to allege loss causation and scienter.

### III.  STANDARDS

A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for pleading "insufficient facts under a cognizable legal theory."  Robertson v. Dean Witter Reynolds Co., 749 F.2d 530, 534 (9th Cir. 1984).  When deciding a motion to dismiss a complaint under Rule 12(b)(6), the court takes all material allegations in the complaint as true and construes those material allegations in the light most favorable to the non-moving party.  Sanders v. Kennedy, 794 F.2d 478, 481 (9th Cir. 1986); NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  However, the

[1] Plaintiffs filed a Motion to Strike and Opposition to Defendants' Request for Judicial Notice in Support of Defendants' Motion to Dismiss (hereafter, "Motion to Strike," Docket Item No. 96.)  Plaintiffs oppose judicial notice of Defendants' Exhibits P-U (analysts' reports), Y (website), and Z (report) and move to strike Defendants' arguments based on these materials.  (Motion to Strike at 1-2.)  Since the Court's Order does not reference any of these exhibits, Plaintiffs' Motion to Strike is denied as moot.

**United States District Court**
For the Northern District of California

court need not accept wholly conclusory allegations. Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981), cert. denied, 454 U.S. 1031 (1981); Kennedy v. H&M Landing, Inc., 529 F.2d 987, 989 (9th Cir. 1976).

Claims brought under Section 10(b) of the Exchange Act and Rule 10b-5 must meet the particularity requirements of Federal Rule of Civil Procedure 9(b). In re Daou Sys., Inc. Sec. Litig., 411 F.3d 1006, 1014 (9th Cir. 2005). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Moreover, claims brought under Section 10(b) and Rule 10b-5 must also meet the stringent pleading standards of the Private Securities Litigation Reform Act of 1995. To plead a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005). The PSLRA amends the Exchange Act to require that a private securities fraud litigation complaint "plead with particularity both falsity and scienter." In re Daou, 411 F.3d at 1014. Specifically, a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002).

## IV. DISCUSSION

Defendants challenge the particularity and sufficiency of Plaintiffs' pleadings with respect to scienter and loss causation.

**A.    Loss Causation**

Defendants contend that the Second Amended Complaint does not sufficiently allege the causal connection between a misrepresentation and a loss that is required to satisfy Rule 10b-5's

4

United States District Court
For the Northern District of California

pleading requirements. (Defendants' Notice of Motion and Motion to Dismiss Second Amended Consolidated Complaint and Memorandum of Points and Authorities in Support Thereof at 17-18, hereafter, "Motion," Docket Item No. 90.) Plaintiffs contend that they have satisfied the loss causation pleading requirement of Federal Rule of Civil Procedure 8(a)(2) by describing the relevant economic loss and providing an indication of the causal connection between their loss and Defendants' misconduct. (Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Consolidated Complaint at 21, hereafter, "Opposition," Docket Item No. 94.)

To plead loss causation adequately, a plaintiff must allege a causal connection between the defendant's material misrepresentation and the plaintiff's loss; that is, the "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." 15 U.S.C. § 78u-4(b)(4); Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341 (2005); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2nd Cir. 2005). The plaintiff "must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss." Lentell, 396 F.3d at 173 (quoting Suez Equity Investors, L.P. v. Toronto Dominion Bank, 250 F.3d 87, 95 (2nd Cir. 2001) (emphasis in original.)) If a plaintiff alleges a fraud on the market, a mere allegation of an inflated purchase price does not constitute or proximately cause a relevant economic loss, because:

> [A]t the moment that the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price might mean a later loss. But this is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, or other events, which taken separately or together account for some or all of that lower price.

Id. at 342-43.

The Ninth Circuit considered loss causation under the Dura framework in the case of In re Daou Systems, Inc., 411 F.3d 1006, 1014 (9th Cir. 2005). The court held that the Daou complaint

adequately pled loss causation by alleging that "the drop in Daou's stock price was causally related to Daou's financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned." Id. at 1026. The complaint alleged that the defendants' belated revelation of the company's true financial condition "led to a 'dramatic, negative effect on the market, causing Daou's stock to decline to $3.25 per share, a staggering 90% drop from the Class Period high of $34.375 and *a $17 per share drop from early August 1998*.'" Id. (emphasis in original.) Lastly, the complaint alleged that "Daou's stock price has never recovered and the Company has never been able to match the artificially inflated revenues reported during the Class Period." Id. The Daou court found these allegations sufficient to plead loss causation.

In this case, whether Plaintiffs have adequately pled loss causation is grounded on four events that allegedly occurred between November 3 and November 9, 2004. First, Impax publically announced on November 3 that it was delaying the release of 3Q04 financials to allow its independent auditors more time to complete their review. Second, Andrx, one of Impax's partners, disclosed on November 3 that it was reducing its revenue for sales generated through its agreements with Impax and Teva by $9 million. Third, Impax announced on November 9 that it was restating its 1Q04 and 2Q04 financial results due to customer credits granted by Teva on sales of Impax's bupropion products. Fourth, Impax also disclosed on November 9 that it had submitted a new drug application for the generic version of Concerta to the FDA and that it had received approval for drugs during the third quarter, including a 500 mg generic version of Wellbutrin SR. The Court considers the sufficiency of each allegation for loss causation purposes.

**1.      Impax's November 3 Press Release**

Plaintiffs allege that Impax's November 3, 2004 Press Release entitled, "IMPAX Laboratories Postpones Third Quarter 2004 Financial Results Conference Call to Tuesday, November 9, 2004," stated as follows:

> IMPAX Laboratories, Inc. . . . today announced that the Company has postponed its release of 2004 third quarter financial results to Tuesday, November 9, 2004 in order to allow its independent auditors more time to complete their review of the Company's third quarter financial statements, including the timing of certain

6

customer credits on bupropion products marketed by a strategic partner. Results were originally scheduled to be announced on Thursday, November 4, 2004.

(SAC ¶ 161.) Plaintiffs further allege, "On this news, the Company's shares plummeted from $13.00 to $10.07, a one-day decline of 23% on volume of 6.77 million shares." (SAC ¶ 162.)

Applying Dura, the Court finds that it is the content of the November 3 press release, rather than its mere issuance, that is critical to the loss-causation analysis. Impax's November 3 announcement concerned only the release of 3Q04 results. The November 3 announcement did not indicate that the 1Q04 or 2Q04 financial statements or revenues would be altered. However, Plaintiffs' Second Amended Complaint only alleges material misstatements or omissions with respect to Impax's 1Q04 and 2Q04 financial results. Since Impax's November 3 press release does not address these financial results, the Court finds that it did not disclose a previously made misstatement or omission. Thus, Plaintiffs' allegations that the value of Impax's securities was negatively affected by the November 3 press release are insufficient to allege loss causation under Dura.

### 2. Andrx's November 3 Disclosure

Plaintiffs allege that the 23 percent decline in the value of Impax stock on November 3 was also due to information provided to the market by Impax's partner, Andrx:

> In its 3Q04 Report on Form 10-Q, issued November 3, 2004, Andrx announced to the market that sales generated through its agreements with Teva and Impax were "significantly impacted by shelf-stock adjustments granted by Teva for generic Wellbutrin SR 150 mg." According to statements made by Andrx's CEO in a press release issued to the market on November 3, 2004, Andrx's share of the customer credits equaled an approximate $9 million decrease in revenues and operating income. This $9 million revenue reduction was a significant portion of the $35.4 million in revenue generated year-to-date for Andrx through bupropion products. This information, released to the market on the same day as Impax's announcement of its own difficulties with customer credits, shed light for investors on the significant impact of Impax's fraud on Impax's revenue restatement and overall financial health.

(SAC ¶¶ 202-03.)

Andrx's announcement of a $9 million decrease in revenues and operating income for 3Q04 suggested, at most, that Impax's *third quarter* results might disappoint investors. However, Andrx's

United States District Court

For the Northern District of California

announcement cannot be construed to mean that Impax's first and second quarter financial statements were incorrect or would be restated. Andrx's statements, then, did not represent a public disclosure of the truth with respect to Impax's alleged material misstatements in its 1Q04 and 2Q04 financial statements, as <u>Dura</u> requires.[2] The Court finds that whether taken separately or together with Impax's November 3 announcement, Plaintiffs' allegations concerning Andrx's statement are insufficient to establish loss causation under <u>Dura</u>.

**3.      Impax's November 9 Announcement Re: Financial Restatements**

Plaintiffs allege that on November 9, Defendants made additional misrepresentations when they disclosed their restatement of first and second quarter results:

> [D]efendants revealed that [Impax's] strategic alliance partner, Teva, had accepted large returns from its customers and Impax was forced to announce a restatement of its financial statements for the first and second quarters of 2004. The restatement reduced total revenues for 1Q04 by $4,308,000, from $38,853,000 to $34,545,000. Total revenues for 2Q04 were reduced by $281,000, from $30,845,000 to $30,564,000. On November 9, 2004 defendants issued a press release describing, in part, the details of their restatement of first and second quarter results. In addition, on November 9, 2004, defendants held a conference call to discuss Impax's third quarter financial results. As a part of this conference call, defendants discussed the restatement due to bupropion and made several false representations that suggested the restatement of the bupropion credits was a historical event with a level of certainty and finality.

(SAC ¶¶ 204-05.)

Impax's November 9 disclosure was the first time that the truth about Impax's 1Q04 and 2Q04 financial results was disclosed to the market. However, Impax's stock value increased by sixty cents on November 9, closing at $11.85. (Defendants' Request for Judicial Notice in Support of Defendants' Motion to Dismiss, hereafter, "RJN," Ex. N, Docket Item No. 92.)[3] On November 10, Impax's stock again closed up at $12.73. <u>Id.</u> On November 11, Impax's stock again closed up at $13.30. <u>Id.</u> The November 11 closing price was also an increase over the November 3 closing price

---

[2] In finding that the <u>Dura</u> plaintiffs had insufficiently pled loss causation, the Supreme Court cited their failure "to claim that Dura's share price fell significantly after the truth became known." <u>Dura</u>, 544 U.S. at 347.

[3] The Court takes judicial notice of Impax's closing stock prices on November 9-11, 2004 pursuant to Federal Rule of Evidence 201.

8

United States District Court

For the Northern District of California

of $13.00.[4]  The Court finds that Plaintiffs have not alleged loss causation under <u>Dura</u> based on Impax's November 9 disclosure that it would be restating its 1Q04 and 2Q04 revenues.

### 4.   Impax's Other Announcements on November 9

Plaintiffs allege that in Defendants' November 9 conference call, they released positive news to the market that accounts, at least partially, for the increases in Impax's stock price between November 9 and November 11, 2004:

> In the November 9, 2004 conference call, defendants disclosed for the first time that it [sic] had submitted an ANDA [abbreviated New Drug Application] for the generic version of Concerta to the FDA.  Impax also confirmed that it had received ANDA approval for two drugs during the third quarter, the 500 mg version of Wellbutrin SR and a generic version of 80 mg Oxycontin.  By revealing these positive milestones for the Company on November 9, 2004, defendants offset the negative news of their restatement.  Analysts confirmed the importance of these additions to Impax's forecasts.  On November 9, 2004, Credit Suisse First Boston issued an analyst report that confirming [sic] the importance of this announcement, stating that "[a]lthough we had previously highlighted that Impax was likely developing a generic Concerta, we are now formally adding the product to our Impax forecasts."  Similarly, Smith Barney Citigroup explained its valuation of Impax on November 9, 2005, "Although the company has only recently transitioned into profitability, we believe the successful launch of generic Wellbutrin SR [500 mg strength] and the upcoming launch of generic Oxycontin will quickly provide Impax with an earnings base that allows it to be compared with its generic peers."  As a result of these additions to Impax's generic drug portfolio and defendants' misrepresentations regarding the finality and certainty of its restatement of bupropion credits, the stock increased in value over the next two days from $11.85 on November 9, 2004 to $13.30 on November 11, 2004.

(SAC ¶¶ 206-07.)  The parties dispute, *inter alia*, whether stock analysts had previously considered this positive news in their previous coverage of Impax stock.  However, for purposes of this motion, the Court need not resolve any factual dispute with respect to this positive news.  Impax's November 9 disclosure of positive news does not alter a simple reality:  there was no loss associated with Impax's announcement that it would restate its 1Q04 and 2Q04 revenues, because the stock price increased after the truth was disclosed.

---

[4] The November 3 closing price was the stock price immediately prior to Impax's press release on the evening of November 3, which announced that 3Q04 financial results would be delayed.

9

The Court dismisses Plaintiffs' First Cause of Action for violation of Section 10(b) of the Exchange Act and Rule 10b-5, for failure to allege loss causation, with leave to amend.

**B.    Scienter**

Since the Court finds that Plaintiffs have inadequately alleged loss causation, it does not consider whether the Second Amended Complaint adequately alleges scienter.

**C.    Control Person Liability**

To allege a Section 20(a) violation adequately, a plaintiff must prove (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator.  Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).  To establish a prima facie case, the plaintiff need not show the defendant's actual participation or exercise of power.  Moreover, a defendant is entitled to a good faith defense if he or she can show no scienter and an effective lack of participation.  Id.  The Court has already found that Plaintiffs have not adequately pled a primary violation of a federal securities law under the PSLRA.  Accordingly, the Court dismisses Plaintiffs' Second Cause of Action for violation of Section 20(a) of the Exchange Act for control person liability, with leave to amend.

## V.  CONCLUSION

The Court dismisses Plaintiffs' Second Amended Complaint without prejudice.  If Plaintiffs wish to file a Third Amended Complaint consistent with this Order, Plaintiffs shall file and serve the amended complaint no later than **February 5, 2007**.  The Third Amended Complaint, if filed, shall strictly follow the format in the Court's subsequent Order Regarding Structure of Complaint Governed by Private Securities Litigation Reform Act.

Dated:  January 3, 2007

JAMES WARE
United States District Judge

10

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Azra Z. Mehdi azram@lerachlaw.com
Dale E. Barnes dale.barnes@bingham.com
Elizabeth P. Lin elin@milbergweiss.com
Joseph Otto Click click@blankrome.com
Monique Winkler MoniqueW@lerachlaw.com
Patrick J. Coughlin patc@lerachlaw.com
Robert S. Green RSG@CLASSCOUNSEL.COM
Shana Eve Scarlett shanas@lerachlaw.com
Tricia Lynn McCormick triciam@lerachlaw.com
William S. Lerach e_file_sd@lerachlaw.com
Willow E. Radcliffe willowr@lerachlaw.com

**Dated:  January 3, 2007**                    **Richard W. Wieking, Clerk**

**By:   /s/ JW Chambers**
           **Elizabeth Garcia**
           **Courtroom Deputy**

**United States District Court**
For the Northern District of California