United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NO. C 04-04802 JW

In re Impax Laboratories, Inc.
Securities Litigation

**ORDER UPON RECONSIDERATION GRANTING DEFENDANTS' MOTION TO DISMISS; GRANTING PLAINTIFFS' LEAVE TO SUBSTITUTE A NEW LEAD PLAINTIFF**

## **I. INTRODUCTION**

This is a securities fraud class action brought on behalf of investors who acquired Impax Laboratories, Inc. ("Impax") securities between May 5, 2004 and November 3, 2004 (the "Class Period") against Impax and certain members of Impax's senior officers and directors (collectively, "Defendants"). Plaintiffs allege violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC").

Presently before the Court is Defendants' Motion for Reconsideration[1] of the Court's July 2007 Order denying Defendants' Motion to Dismiss the Third Amended Consolidated Complaint.[2] The Court conducted a hearing on October 11, 2007. Based on the papers submitted to date and oral arguments of counsel, the Court GRANTS Defendants' Motion for Reconsideration, and upon

---

[1] (hereafter, "Motion," Docket Item No. 129.)

[2] (hereafter, "July 2007 Order," Docket Item No. 127.)

1  reconsideration, GRANTS Defendants' Motion to Dismiss Lead Plaintiff Local 665 for lack of
2  standing.  However, the Court GRANTS Plaintiffs leave to substitute Dearborn Heights Act 345
3  Police & Fire Retirement Systems as the new Lead Plaintiff.

## II.  BACKGROUND

In a Third Amended Consolidated Complaint filed on February 5, 2007, Plaintiffs allege as follows:

Plaintiffs[3] purchased Impax securities during the Class Period and suffered losses as a result of Defendants' actions.  (Id.)  Defendant Impax is a small pharmaceutical company that develops, sells, and markets generic pharmaceuticals, including variations of bupropion hydrochloride ("bupropion"), the generic version of Wellbutrin (an anti-depressant).  (TAC ¶ 3.)  Individual Defendants Barry R. Edwards, Dr. Charles Hsiao, Dr. Larry Hsu, Cornel C. Spiegler, David S. Doll, and David J. Edwards were directors, officers, or high-ranking employees of Impax during the Class Period.  (TAC ¶¶ 14-20.)

Non-party Teva Pharmaceuticals Industries, Ltd. ("Teva") is a global pharmaceutical company and one of the world's largest generic drug companies.  (TAC ¶ 70.)  Part of Teva's strategy is to reach the market with generic versions of branded pharmaceuticals as quickly as possible; it develops alliances with partners to acquire rights to generic products, or otherwise shares development costs or litigation risks.  (Id.)

In June 2001, Impax and a Teva subsidiary entered into a Strategic Alliance Agreement ("SAA").  (TAC ¶¶ 3, 69.)  Under the SAA, Teva received exclusive U.S. prescription-marketing rights for six of Impax's products, including bupropion products; Impax shared in Teva's profits from sales of the products.  (TAC ¶ 71.)  Non-party Andrx Corporation ("Andrx") was also a signatory to the SAA.  (TAC ¶ 73.)

---

[3] The named Plaintiffs are (1) United Food & Commercial Workers Union Local 655, AFL-CIO, Food Employers Joint Pension Plan and (2) Dr. Melvin M. Owen.  (Third Amended Consolidated Complaint for Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ¶¶ 11-12, hereafter, "TAC," Docket Item No. 112.)

On March 22, 2004, Impax announced that the Food and Drug Administration ("FDA") had granted final marketing approval to its Abbreviated New Drug Application ("ANDA") for bupropion 150 mg controlled release tablets. (TAC ¶ 170.) Impax immediately began shipping 100 mg and 150 mg doses of bupropion to Teva to sell to the market. (Id.)

As a result, on May 5, 2004, Impax reported its first profitable quarter, 1Q04, with revenues of $38.8 million, $26.6 million of which was attributable to Impax's share of bupropion revenues. (TAC ¶ 80.)

On August 4, 2004, Impax reported that its 2Q04 revenues were $30.8 million, of which $8.1 million was attributable to Impax's share of bupropion revenues. (TAC ¶ 280.) The second quarter revenues from bupropion were lower than expected. (TAC ¶ 134.)

On November 3, 2004, Impax announced that its 3Q04 results would be delayed to review customer credits on bupropion given by its strategic partner. (TAC ¶ 135.) The November 3, 2004 announcement did not explicitly notify investors that Impax would be forced to restate the 1Q04 and 2Q04 financial results. (TAC ¶ 141.)

On November 9, 2004, Impax released its 3Q04 results and restated its 1Q04 and 2Q04 results. (TAC ¶ 144.) Impax lowered its 1Q04 results by $4.3 million and its 2Q04 results by $281,000, reducing earnings by $0.07 per share. (Id.) Impax's stock increased in value over the following two days, from $11.85 on November 9, 2004 to $13.30 on November 11, 2004. (TAC ¶ 148.)

Plaintiffs' Third Amended Consolidated Complaint alleges two causes of action against Impax: 1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 by issuing false or misleading statements about Impax's reserves, revenues, and income; and 2) violation of Section 20(a) of the Exchange Act, for control person liability.

In the July 2007 Order, the Court denied Defendants' Motion to Dismiss, finding that the Third Amended Consolidated Complaint adequately pleads scienter and loss causation. Defendants

3

subsequently sought leave to file a motion for reconsideration which the Court granted.  (See Docket Item Nos. 129, 134.)  Presently before the Court is Defendants' Motion for Reconsideration.

### III.  STANDARDS

A motion for reconsideration is appropriate where the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, (3) if there was an intervening change in controlling law.  See School District No. 1J, Multnomah County v. Acands, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993).  "[A] motion for reconsideration should not be granted, absent highly unusual circumstances."  See 389 Orange St. Partners v. Arnold, 179 F.3d 656, 665 (9th Cir. 1999).  A motion for reconsideration may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.  See id.; Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir. 2000).

### IV.  DISCUSSION

Defendants move for reconsideration of the Court's findings that Plaintiffs have adequately alleged scienter and loss causation in their Third Amended Consolidated Complaint.  (Motion at 2.)  The Court finds that its scienter analysis in the July 2007 Order is consistent with the operative pleading and existing Ninth Circuit precedent.  Accordingly, the Court proceeds only to reconsider its loss causation analysis, and any implications that analysis may have on Lead Plaintiff Local 655's standing.  Thus, the Court conducts a *de novo* review of Defendants' motion to dismiss and applies the Rule 12(b)(6) standards previously articulated in its July 2007 Order.[4]

**A.     Loss Causation**

The issue is whether Plaintiffs have adequately plead loss causation, and if so, on what date Plaintiffs suffered loss.

To plead loss causation adequately, a plaintiff must allege a causal connection between a defendant's material misrepresentation and the plaintiff's loss; that is, the "misstatement or omission

---

[4] See Erdman v. Nationwide Ins. Co., 2007 WL 2428697, at *2 (M.D. Pa. 2007) (It follows from this remedial purpose that once a motion for reconsideration is granted, the standard of review upon reconsideration is the standard applicable in the underlying motion).

concealed something from the market that, when disclosed, negatively affected the value of the security." 15 U.S.C. § 78u-4(b)(4); Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341 (2005); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2nd Cir. 2005). The plaintiff "must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss." Lentell, 396 F.3d at 173 (quoting Suez Equity Investors, L.P. v. Toronto Dominion Bank, 250 F.3d 87, 95 (2nd Cir. 2001) (emphasis in original)).

While it appears that a plaintiff's allegations of loss causation need only meet the pleading requirements of Rule 8(a)(2), the allegations must still provide the defendant fair notice of the grounds upon which the plaintiff's claim rests. Dura, 544 U.S. at 347. Thus, if the plaintiff alleges a fraud on the market, a mere allegation of an inflated purchase price is not sufficient to plead the fraud constituted or proximately caused a relevant economic loss. Id. at 342-43. Pleading loss causation under the fraud on market theory requires a plaintiff to (1) identify the fraudulent statement that causes the stock price to increase, (2) identify the statements or acts which revealed to the market that the statement was fraudulent, and (3) show a decline in stock price after the revelation. See id. at 346; In re Daou Sys., Inc. Sec. Litig., 411 F.3d 1006, 1025-26 (9th Cir. 2005).

In this case, Plaintiffs allege that Defendants made three fraudulent statements in May 2004. (TAC ¶¶ 80, 154, 183.) The Court proceeds to examine these statements and the alleged "revelations" that identified them as false.

**1.     The First Allegedly False Statement**

The first allegedly false statement concerns Impax's revenues for the First Quarter of 2004. Impax stated in a press release and later in its SEC filings that: "[First Quarter 2004] revenues were a record $38.8 million, up more than 240% from [First Quarter 2003]." (TAC ¶¶ 80, 183, hereafter, "First Quarter of 2004 Statement.") Plaintiffs allege that the statement is false because it incorrectly reports first quarter revenues. (TAC ¶ 86.)

Plaintiffs allege that this statement was partially revealed as false in August 2004 when Impax announced:

5

> Total revenues for the second quarter of 2004 were $30.8 million, more than double total revenues of $14.1 million in the prior year's second quarter . . . The sequential quarter decline was due to timing of bupropion shipments and pipeline filling, particularly as related to the launch of Bupropion Hydrochloride in the first quarter. During the 2004 second quarter, IMPAX's revenues from sales of Bupropion Hydrochloride products, through our strategic alliance agreements with Teva and Andrx, were approximately $8.1 million, compared with $23.9 million in the first quarter . . .

(TAC ¶ 280.) The August statement reports the revenues for the Second Quarter of 2004. The August statement further explains that Second Quarter revenues were lower than First Quarter revenues because of the "timing of bupropion shipments and pipeline filling, particularly as related to the launch of Bupropion Hydrochloride in the first quarter."[5] The Court finds that on its face, there is no indication in this statement that the revenues reported in the First Quarter were incorrect. Accordingly, the August statement does not "reveal" that the First Quarter of 2004 Statement's reporting revenues was false.

Plaintiffs then allege that the reality of the situation was fully revealed to the market on November 3, 2004, when Impax announced:

> IMPAX Laboratories, Inc . . . today announced that the Company has postponed its release of 2004 third quarter financial results to Tuesday, November 9, 2004 in order to allow its independent auditors more time to complete their review of the Company's third quarter financial statements, including the timing of certain customer credits on bupropion products marketed by a strategic partner. Results were originally scheduled to be announced on Thursday, November 4, 2004.

(TAC ¶ 135.) The Court finds that on its face, the November 3, 2004 statement only concerns Impax's Third Quarter results. The statement does not mention First Quarter results directly. However, bupropion was launched in the First Quarter and the August statement reported that revenues were down in the Second Quarter. Therefore, the market would have been on notice that problems related to "the timing of certain customer credits on bupropion products," as reported in the November 3, 2004 announcement, might impact the First and Second Quarter results. This was the reasoning of the July 2007 Order in which the Court found that the November 3, 2004 statement,

---

[5] During oral argument, counsel for Defendants explained that "pipeline filling" referred to the process of filling distribution and retail inventories. Once these channels are full, future sales are dependant on actual end-user purchases.

*in light of* the August 2004 statement, put the market on notice that First and Second quarter results would potentially be affected. Impax formally restated its First Quarter revenue on November 9, 2004. (TAC ¶ 144.)

Since it was the November 3, 2004 announcement and not the August 2004 statement that fully revealed the alleged falsity of the First Quarter Statement, the Court finds that the controlling date for loss causation related to the First Quarter Statement is November 3, 2004.

### 2. The Second Allegedly False Statement

The second allegedly false statement concerns Defendants' comments regarding the market for bupropion products. Impax's President, Defendant Larry Hsu, stated in a press release in May 2004 as follows:

> The launch of our generic Wellbutrin SR represents IMPAX's single largest product opportunity to date. According to NDCHealth, U.S. sales of Wellbutrin SR 100 mg and 150 mg, marketed by GlaxoSmithKline (NYSE:GSK), were approximately $1.4 billion in the twelve months ended February 29, 2004 . . .

(TAC ¶ 154, hereafter, "Larry Hsu's Statement.") Plaintiffs allege that Larry Hsu's Statement is false because it indicates that buproprion sales would be stronger than they ultimately were. (TAC ¶ 133.) Plaintiffs allege that Defendants knew in May that Second Quarter sales would be lower because the pipeline for bupropion had already been filled. (TAC ¶ 178.)

However, Larry Hsu's Statement contains verifiable facts. The first part of the statement reflects Defendants' belief that bupropion was its "single largest product opportunity." Plaintiffs concede that buproprion was "Impax's best chance at profitability." (TAC ¶ 4.) The second part of the statement recites the revenues earned by GlaxoSmithKline, the maker of the name-brand version of bupropion, in the previous year. There is no allegation that Defendants inaccurately recited GlaxoSmithKline's revenues.

The basis of Plaintiffs' falsity allegation is that Defendants did not make negative statements regarding its future sales prospects. As a matter of law, silence is not misleading in the absence of a duty to disclose. In re Verifone Securities Litigation, 784 F. Supp. 1471, 1480 (N.D. Cal. 1992); see In re Convergent Technologies Securities Litigation, 948 F.2d 507 (9th Cir. 1991). Courts in this

7

1  circuit have held that defendants are not required to disclose that their earnings include one-time

2  sales that would likely not recur. See In re Redback Networks, Inc. Securities Litigation, 2007 WL

3  963958, at *5 (N.D. Cal. 2007) (citing In re Verifone Securities Litigation, 784 F. Supp. at 1480).

4  Further, defendants are not required to disclose internal projections about future prospects. In re

5  Convergent, 948 F.2d at 516.

6  Accordingly, the Court finds that Defendants' failure to make negative predictions based on

7  their alleged knowledge of pipeline filling is not actionable conduct.

### 3. The Third Allegedly False Statement

The third allegedly false statement concerns Defendants' comments regarding credits and rebates it offered in connection with bupropion products. In May 2004, Defendants stated:

> The rebates, chargebacks, returns and other credits decreased for the three months ended March 31, 2004 to approximately 14% of product sales as compared to approximately 22% for the comparable period in 2003. This decrease was mainly due to Bupropion Hydrochloride 100mg and 150 mg Controlled Release Tablets, Loratadine, and Pseudoephedrine Sulfate (5 mg/120 mg) 12-hour Extended Release Tablets which are exempt from rebates, chargebacks and other credits as per the agreements with Schering-Plough, Wyeth, and Novartis . . .

(TAC ¶ 192, hereafter, "Credits and Rebates Statement.") The first part of the Statement reports that the company issued fewer rebates and credits on its products in the First Quarter of 2004 than it had in the First Quarter of 2003. Since the company issued fewer rebates and credits, it ostensibly earned greater profit on its sales. The second part of the statement explains that the credits decreased because the company does not issue credits for bupropion products under sales agreements with certain distributors.

Plaintiffs allege that the statement is false because Impax did issue credits on bupropion sales to Teva. (TAC ¶ 86.) Plaintiffs allege that this statement was partially revealed as false in August 2004 when Impax announced:

> Total revenues for the second quarter of 2004 were $30.8 million, more than double total revenues of $14.1 million in the prior year's second quarter . . . The sequential quarter decline was due to timing of bupropion shipments and pipeline filling, particularly as related to the launch of Bupropion Hydrochloride in the first quarter. During the 2004 second quarter, IMPAX's revenues from sales of Bupropion Hydrochloride products, through our

8

> strategic alliance agreements with Teva and Andrx, were approximately $8.1 million, compared with $23.9 million in the first quarter . . .

(TAC ¶¶ 201, 280.)  The August statement reports revenues for the Second Quarter and explains why revenues were lower than in the First Quarter.  The statement does not make any implicit or explicit reference to rebates or credits.  Thus, there is no basis to find that the August statement revealed that Impax was issuing credits on bupropion products.

Plaintiffs then allege that the truth was fully revealed to the market on November 3, 2004, when Impax announced:

> IMPAX Laboratories, Inc . . . today announced that the Company has postponed its release of 2004 third quarter financial results to Tuesday, November 9, 2004 in order to allow its independent auditors more time to complete their review of the Company's third quarter financial statements, including the timing of certain customer credits on bupropion products marketed by a strategic partner.  Results were originally scheduled to be announced on Thursday, November 4, 2004.

(TAC ¶ 135.)  The phrase "including the timing of certain customer credits on bupropion products" in the November statement clearly implies that Impax was issuing credits on bupropion products.  Plaintiffs allege that the November 3, 2004 announcement caused another significant same-day price decline.  (TAC ¶ 140.)  Thus, a reasonable jury could infer that the Credits and Rebates Statement denying such credits was potentially false.  Since it was the November 3, 2004 announcement, and not the August statement, that fully revealed the alleged falsity of the Credits and Rebates Statement, the Court finds that the controlling date for loss causation related to this Statement is November 3, 2004.

**B.      Lead Plaintiff's Standing**

In the alternative, Defendants move to dismiss Lead Plaintiff Local 655 on the ground that it does not have standing because its losses were not caused by Defendants' conduct.  (Motion at 2.)

Constitutional standing requires that a plaintiff show (1) an injury in fact (2) that is fairly traceable to the defendant's actions and (3) that will likely be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  In a class action, a lead plaintiff must show that it personally has been injured, "not that injury has been suffered by other, unidentified

9

1 members of the class to which [it] belong[s] and which [it] purport[s] to represent." Warth v. Seldin,
2 422 U.S. 490, 502 (1975).

3 In this case, Lead Plaintiff Local 665 purchased 25,000 shares of Impax stock on May 24,
4 2004 and sold those shares in August and October 2004.[6] (TAC, Ex. A.) Since Lead Plaintiff Local
5 665 sold all of its shares before the November 3, 2004 statement was made, it cannot have suffered
6 loss as a result of the November 3 statement. A shareholder who sells stocks before a disclosure of
7 truthful information will not have suffered any loss based on a misrepresentation related to that
8 information. Dura, 544 U.S. at 342. Accordingly, Lead Plaintiff Local 665 does not have standing
9 to bring suit.

10 Plaintiffs rely on Blackie v. Barrack, 524 F.2d 891 (9th Cir. 1975), for the proposition that
11 "lead plaintiff may represent a class of sellers during the entire class period, regardless of the timing
12 of his individual transactions." (Opposition at 9.) However, Blackie involved a plaintiff who
13 himself had been defrauded. 524 F.2d at 902. In contrast, Lead Plaintiff Local 655 has failed to
14 demonstrate individual standing on the basis of its own injury in fact.

15 Accordingly, the Court GRANTS Defendants' Motion to Dismiss and DISMISSES Lead
16 Plaintiff Local 665 for lack of standing, with prejudice.

17 **C.    Substituting New Lead Plaintiff**

18 Plaintiffs request leave to add a new Lead Plaintiff, or in the alternative, to permit the City of
19 Dearborn Heights Act 345 Police & Fire Retirement Systems to intervene in the action. (hereafter,
20 "Plaintiffs' Motion," Docket Item No. 148.) The parties dispute whether another lead plaintiff may

---

[6] While the general rule is that "[m]atters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss," in a securities action, a court may also consider documents that the defendant has attached to its motion to dismiss either as exhibits or accompanied by a request for judicial notice. Weiner v. Klais and Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997).

1 be appointed to take the place of the now dismissed Plaintiff Local 665 in light of the Private

2 Securities Litigation Reform Act's ("PSLRA") lead plaintiff selection process.[7]

3       In March of 2005, the Court appointed Plaintiff Local 665 as Lead Plaintiff in this

4 consolidated action, with Dr. Melvin Owen remaining as the other named Plaintiff.  (See Docket

5 Item No. 41.)  Dr. Owen allegedly purchased 1,000 shares of Impax stock on June 16, 2004.  (TAC,

6 Ex. B.)  Defendants do not challenge Dr. Owen's standing in light of the Court's loss causation

7 analysis.  However, Defendants oppose the appointment of Dr. Owen as an alternative Lead Plaintiff

8 because he did not participate in the Lead Plaintiff appointment process as required by the PSLRA.

9 (Motion at 4.)  Plaintiffs do not seek to appoint Dr. Owen as Lead Plaintiff.  (Opposition at 11.)

10 Instead, Plaintiffs seek to add Dearborn Heights as the new Lead Plaintiff.  Plaintiffs represent that

11 Dearborn Heights held 7,550 shares through the end of the Class Period.  (Plaintiffs' Motion at 2.)

12       With respect to whether the Court should permit a substitution of an alternative Lead

13 Plaintiff, or an intervention by a party who may have standing at this stage of the litigation, the

14 Court finds two opinions in this district instructive.

15       In In re Portal Software, Inc. Securities Litigation, nine months after a lead plaintiff had been

16 appointed, plaintiffs sought leave to file a second consolidated amended complaint to add a pension

17 fund trust as a proposed representative of a putative Rule 23 class.  C-03-5138-VRW, Docket Item

18 No. 100. (hereafter, "VRW's Order.")  Defendants contend that the pension fund trust may not be

19 added to the complaint without triggering the PSLRA's lead plaintiff process.  (VRW's Order at 5.)

20 Chief Judge Walker examined the legislative intent of the PSLRA lead plaintiff provisions and

21 concluded that subjecting the pension fund trust to the process would not serve Congressional intent

22 because the PSLRA imposes no affirmative duties on the lead plaintiff other than those imposed on

23 any representative of a Rule 23 class.  (VRW's Oder at 7.)  Chief Judge Walker concluded:

---

[7] (Plaintiffs' Motion at 3-4; Defendants' Opposition to Plaintiffs' Request for Leave to Add Plaintiff, or in the Alternative, The City of Dearborn Heights Act 345 Police & Fire Retirement Systems' to Intervene at 6, hereafter, "Defendants' Opposition," Docket Item No. 151.)

11

> . . . that [pension fund trust] is not subject to the PSLRA's lead plaintiff provisions as matter of the statute's text or its drafters' purposes. There is a practical sense to this outcome. First, as this case aptly demonstrates, the need to add representative plaintiffs may arise after a case has been initiated. It would turn securities litigation into a game of snakes and ladders to hold that any time a new plaintiff is added, the action must "go back to square one" and recommence the PSLRA lead plaintiff selection process. Relatedly, there is no indication that Congress intended such repetitive preliminaries to securities litigation. The PSLRA's lead plaintiff provision is designed only to get cases off on the right foot. (One may debate whether the PSLRA does so, but that is another matter.) Third, the PSLRA does not -- nor perhaps can any legislative scheme -- address the nuance and complexity of intra-class conflicts. Such conflicts must inevitably be resolved in a judicial proceeding.

(VRW's Order at 10.)

In In re Exodus Communications, Inc. Securities Litigation, defendants filed a motion to dismiss for lack of subject matter jurisdiction once the named plaintiffs were found to lack standing to pursue the claims on behalf of the class. C-01-2661-MMC, Docket Item No. 364. (hereafter, "MMC's Order.") Judge Chesney entertained two motions to intervene in the action. (MMC's Order at 1.) Judge Chesney found that "intervention will not be permitted to breathe life into a nonexistent lawsuit." (MMC's Order at 2, citing, McCluen v. Shamah, 593 F.2d 482, 486 (3d Cir. 1979).) However, even though one of the named plaintiffs had been dismissed for failure to prosecute, Judge Chesney found that the intervenors may intervene in the action to assert a § 11 claim if they can show that the dismissed plaintiff would have had standing to assert such a claim. (MMC's Order at 2.)

The Court adopts Chief Judge Walker's analysis of the legislative intent with respect to the PSLRA's lead plaintiff process and finds that at this stage of the litigation, there is no prejudice in permitting Plaintiffs to substitute a new Lead Plaintiff. Defendants contend In re Portal Software is different from this case because the lead plaintiff had adequately pleaded the damages and loss causation elements of a Rule 10b-5 claim and the court had subject matter jurisdiction over the action. In this case, the proposed new Lead Plaintiff is added not to merely aid the existing Lead Plaintiff but to replace Lead Plaintiff because it has been found to lack standing. (Defendants' Opposition at 7.) Defendants are only partially correct. Defendants ignore the fact that Dr. Owen remains a named Plaintiff and since there has been no challenge to his standing to sue, the Court

12

currently has subject matter jurisdiction over this action.  Likewise, since Dearborn Heights seeks to intervene to assert 10b-5 claims and no challenge has been made to Dr. Owen's standing to make those claims, Dearborn Heights may rely on Dr. Owen's standing.

In the alternative, Defendants contend that Dearborn Heights is barred from serving as a Lead Plaintiff in this action by the professional plaintiff provisions of the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B)(vi), § 77z-1(a)(3)(B)(vi), because it has previously served in a representative capacity in more than six securities class actions in the last three years.  Defendants' objection is not properly raised at this time and in this motion; it may be a subject of an early summary judgment motion.  However, it is worth noting that courts in this circuit have suggested that the professional plaintiff restrictions may not apply to institutional plaintiffs such as Dearborn Heights.  (VRW's Order at 11, citing, Casden v. HPL Technologies, Inc, 2003 US Dist Lexis 19606, at *33-34 (N.D. Cal. Sept. 29, 2003); see also Naiditch v. Applied Micro Circuits Corp., 2001 WL 1659115 (S.D. Cal. Nov. 5, 2001.)

Accordingly, the Court GRANTS Plaintiffs' Request to add Dearborn Heights as the new Lead Plaintiff.

## V.  CONCLUSION

Upon reconsideration, the Court GRANTS Defendants' Motion to Dismiss and DISMISSES Lead Plaintiff Local 665 from the case with prejudice.  The Court GRANTS Plaintiffs' Request to add Dearborn Heights as a new Lead Plaintiff.  Plaintiff shall file the Fourth Amended Consolidated Complaint on or before **May 16, 2008.**

The parties shall appear for a Case Management Conference on **June 9, 2008 at 10 a.m.** to discuss the next step in the litigation.  On or before **May 30, 2008**, the parties shall file a Joint Case Management Statement; the Statement shall set forth a good faith discovery plan.

Dated: April 17, 2008

JAMES WARE
United States District Judge

13

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Azra Z. Mehdi azram@lerachlaw.com
Dale E. Barnes dale.barnes@bingham.com
Elizabeth Pei Lin elin@milbergweiss.com
Joseph Otto Click click@blankrome.com
Monique Winkler MoniqueW@lerachlaw.com
Patrick J. Coughlin patc@lerachlaw.com
Robert S. Green RSG@CLASSCOUNSEL.COM
Shana E. Scarlett shanas@hbsslaw.com
Tricia Lynn McCormick triciam@lerachlaw.com
William S. Lerach e_file_sd@lerachlaw.com
Willow E. Radcliffe willowr@lerachlaw.com

**Dated: April 17, 2008**               **Richard W. Wieking, Clerk**

                                        **By:  /s/ JW Chambers**
                                              **Elizabeth Garcia**
                                              **Courtroom Deputy**