BLANK ROME LLP
MICHAEL JOSEPH (pro hac vice)
JOSEPH O. CLICK (pro hac vice)
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
Telephone: 202/772-5966
202/572-8361 (fax)

BINGHAM MCCUTCHEN LLP
DALE BARNES (SBN 99273)
Three Embarcadero Center
San Francisco, CA 94111
Telephone: 415/393-2522
415/393-2286 (fax)

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re IMPAX LABORATORIES, INC. SECURITIES LITIGATION | Master File No. C-04-4802-JW <br><br> <u>CLASS ACTION</u> |
| This Document Related To: <br><br> ALL ACTIONS | DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION |
| | Date: TBD <br> Time: TBD <br> Place: Courtroom 8, Fourth Floor <br> Judge: Hon. James Ware |

DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO MOTION
FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

## DEFENDANTS' RESPONSE TO PLAINTIFFS' OPPOSITION TO MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

On August 7, 2008 defendants moved the Court (i) for leave to file a motion for reconsideration of the Court's July 18, 2007 and April 17, 2008 orders denying defendants' motion to dismiss the Third Amended Consolidated Complaint and denying reconsideration (the "Orders"), and for a stay of proceedings pending disposition of the motion for reconsideration.  This motion was based on the Ninth Circuit's recent opinion in *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, No. 06-55826, -- F.3d --, 2008 WL 2853402 (9th Cir. July 25, 2008), a securities fraud case that analyzes and adopts standards for pleading loss causation that, defendants respectfully submit, are directly contrary to those applied in the Orders here.

Obviously recognizing that *Metzler* provides unimpeachable grounds for this Court to reconsider the Orders and dismiss this case, plaintiffs have filed a so-called "Response" in which they cite another recent opinion of the Ninth Circuit, *Hartman v. Gilead Sciences, Inc. (In re Gilead Sciences, Inc. Sec. Litig.)*, -- F.3d --, 2008 WL 3271039 (9th Cir. August 11, 2008) (attached hereto), and essentially argue the merits of defendants' Motion for Reconsideration.  In doing so, plaintiffs misconstrue both *Gilead* and *Metzler*, and the prior cases that they cite, and argue that the Court should ignore *Metzler* and persist in applying a pleading standard for loss causation that is now unarguably incorrect.  *Metzler* clearly rejected the standard applied in the July 2007 and April 2008 Orders; *Gilead* and *Metzger* are fully consistent with each other—indeed, *Gilead* reinforces *Metzger*—; and *Metzger* faithfully implements *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 344 (2005), and the Ninth Circuit's prior decisions in *Sparling v. Daou (In re Daou Syst., Inc. Sec. Litigation)*, 411 F.3d 1006 (9th Cir. 2005), and *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008).

**I.    *Gilead* Requires Reconsideration and Dismissal of this Case.**

Like *Metzger* and this case, *Gilead* is a fraud-on-the-market securities class action claiming that the issuer-defendant's stock price was inflated due to fraudulently overstated revenues. According to the complaint in *Gilead*, Gilead Sciences, Inc. is a biopharmaceutical company that developed and sold Viread, an antiviral agent used with other drugs to treat HIV.  *Gilead*, 2008 WL

3271039 at *1. Gilead's financial performance and condition were heavily dependent on Viread. *Id.* Plaintiffs alleged that Gilead improperly marketed Viread for so-called "off-label" uses—uses not approved by the FDA and for which the drug could not be lawfully marketed, but did not publicly disclose its off-label marketing in SEC filings or otherwise. *Id.* at *2.

On July 29, 2003, the FDA sent a "Warning Letter" to Gilead stating that at the 15th National HIV/AIDS Update Conference in March and April, a Gilead employee made statements that essentially amounted to marketing Viread for off-label uses, and ordered Gilead to make corrective disclosures to the Conference attendees. *Id.* at *3. The FDA made the Warning Letter public on August 7, and Gilead also disclosed the Warning Letter on August 14 in its second-quarter 2003 SEC Form 10-Q. *Id.* at *3, *4. The market purportedly viewed the Warning Letter as insignificant, as Gilead's stock price actually increased after these disclosures. *Id.* at *3.

The FDA letter, however, caused physicians to significantly curtail prescribing Viread for off-label indications, which, in turn, negatively impacted Gilead's third-quarter 2003 revenues. *Id.* at *4. On October 28, 2003 Gilead disclosed its third-quarter results, showing that third-quarter Viread sales were significantly below expectations. *Id.* at *5. The next day, Gilead's stock dropped 12%. *Id.*

The district court dismissed the action with prejudice for failure to allege loss causation because the plaintiffs had failed to allege a causal connection between the FDA's Warning Letter concerning improper off-label marketing of Viread (the undisclosed practice that rendered other statements misleading) and the October 29 decline in Gilead's stock price.

The Ninth Circuit reversed, reasoning:

> Our review of the Investors' complaint convinces us that the October drop in stock price was plausibly caused by the Warning Letter. Importantly, the drop occurred immediately after Gilead disclosed less-than-expected revenues resulting from the reduction in wholesalers' Viread inventories, which analysts ascribed to lower end-user demand. That lower end-user demand, in turn, is expressly alleged to have been caused by the Warning Letter. In this light, the market did react immediately to the *corrective disclosure*—the October 28 press release.

*Gilead*, 2008 WL 3271039 at *9 (emphasis added).

*Gilead* thus reinforces the Ninth Circuit's holdings in *Metzler* that a plaintiff must plead an actual disclosure of the truth in order to plead loss causation and that allegations of "possible" or "potential" "implication" and market "understandings" are insufficient. In *Gilead*, the two disclosures, read together, first revealed the Gilead had been improperly marketing Viread for off-label uses (the alleged fraudulent practices) and later revealed the actual impact (*i.e.*, a "corrective disclosure") of these practices on Gilead's actual revenues.

*Gilead* also is an example of a case in which disclosure of the truth concerning the alleged misrepresentations occurred in stages. The allegedly fraudulent conduct—the undisclosed off-label marketing of Viread—was disclosed on August 7 when the FDA made public its Warning Letter, while the extent and actual impact of the improper undisclosed marketing was disclosed on October 28, 2003, when Gilead released its third-quarter results reflecting the lower-than-expected revenues (a "corrective disclosure")caused by the decrease in Viread sales caused, in turn, by the FDA Warning Letter. Thus loss causation was established by disclosure of both the actual fraudulent conduct and the actual impact of that conduct. As the Ninth Circuit stated, "Importantly, the drop [in Gillead's stock price] occurred immediately after Gilead disclosed less-than-expected revenues resulting from the reduction in wholesalers' Viread inventories, which analysts ascribed to lower end-user demand … [which] is expressly alleged to have been caused by the Warning Letter." *Gilead*, 2008 WL 3271039 at *9.

In this case, the disclosure relied upon in the Orders is Impax's November 3, 2004 press release announcing a delay in the release of Impax's third-quarter results. The Court has consistently held, however, that the November 3, 2004 press release itself did *not* reveal any fraud or even that Impax's first- and second-quarter financial results were incorrect.[1] And the April 2008

---

[1] *See* April 2008 Order at 6 ("The Court finds that on its face, the November 3, 2004 statement only concerns Impax's Third Quarter results. The statement does not mention First Quarter results directly"); January 2007 Order at 7 ("Impax's November 3 announcement concerned only the release of 3Q04 results. The November 3 announcement did not indicate that the 1Q04 or 2Q04 financial statements or revenues would be altered. … Since Impax's November 3 press release does not address these financial results, the Court finds that it did not disclose a previously made misstatement or omission."); *see also* July 2007 Order at 8-9 (affirming January 2007 Order's holding that November 3 press release itself did not disclose truth concerning misrepresentation).

3

DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO
MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

1  Order (at 6) holds that Impax's August 2004 press release announcing second-quarter results did not

2  reveal that Impax's first- and second-quarter financial results were incorrect or fraudulent.  Thus, the

3  disclosures upon which plaintiffs allegations and the Orders rely do not come close to disclosing the

4  type of information found sufficient for pleading loss causation in *Gilead*.

5       In this case, the disclosure of the actual truth, as required by *Metzler* and *Gilead*, did not

6  occur until Impax first announced on November 9, 2004 that it was restating its first- and second-

7  quarter financial results and the amounts by which those results would be restated.  Just as with

8  *Gilead*'s disclosure of actual third-quarter 2003 results, the market immediately reacted to Impax's

9  disclosure of its actual, restated first- and second-quarter results.  Unlike *Gilead*, however, where the

10 stock price decreased immediately after the corrective disclosure, Impax's stock price immediately

11 *increased* and within two days closed at a price higher than its closing price on November 3, the date

12 of the press release announcing a delay in release of third-quarter results.

13      Plaintiffs note the *Gilead* court's statement that the allegations of a complaint need only

14 support a theory that is "not facially implausible."  There, however, the court was considering

15 allegations that the actual reduced sales figures for Viread, disclosed on October 28, were caused by

16 the reduction in off-label marketing—the actual fraudulent conduct—that had been disclosed by the

17 August 7 announcement.  Here, in contrast, it is facially implausible, as this Court found in its

18 January 2007 Order, that Impax's November 3 disclosure of a delay in the release of *third* quarter

19 results because of the timing of bupropion credits revealed any truth about the company's first- and

20 second-quarter results.  While this Court subsequently concluded that the November 3 disclosure

21 potentially implicated first- and second-quarter results, it was able to do so only by accepting

22 plaintiffs' allegations that "the market understood" such implication—the precise allegations

23 discredited by the Ninth Circuit in *Metzler*.

24      Plainly, plaintiffs have failed to, and cannot plead, loss causation.

25 **II.   *Metzler* Requires Reconsideration and Dismissal.**

26      Claiming that "[i]n light of the clear line of *Dura*, *Daou*, *Berson* and *Gilead*, the Ninth

27 Circuit's decision in [*Metzler*] appears to be aberrant," plaintiffs invite the Court down the same

28                                            4

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

primrose path they charted earlier, improperly relying on *Wagner v. Barrick Gold Corp.*, No. 03 CIV. 4302, 2006 U.S. Dist. LEXIS 3854 at *10-12 (S.D.N.Y. Jan. 31, 2006), as the Ninth Circuit standard for pleading loss causation. The only thing that is inconsistent with this line of cases, however, is plaintiffs' claim that the cases support the July 2007 and April 2008 Orders. As defendants explained in their opening Memorandum in Support of their Motion for Reconsideration (at 8-11), *Metzler* makes clear that *Dura*, *Daou*, and *Berson* all require that there be an actual disclosure of the truth with respect to the alleged misrepresentation. *Metzler* explains that in *Daou* and *Berson* the disclosures were adequate because they disclosed actual, not possible, financial results, and, as explained above, *Gilead* is in accord because the complaint there alleged disclosures of the actual conduct that was allegedly fraudulent and of the actual financial results.[2] A necessary corollary of this requirement, now made clear in *Metzler*, is that a disclosure does not provide a causal link if it reveals only "possible" or "potential" "implications" or "market understandings". *Metzler*, 2008 WL 2853402 at *8-*9.

    Plaintiffs argue that they did not allege "euphemisms" but instead alleged that on November 3 Impax "told the market about problems with 'the timing of certain customer credits on bupropion products'" Opp. 2 (quoting April 2008 Order at 6). But, as we have seen, the Court has already, on multiple occasions, found that the November 3 press release referred only to third-quarter results and did not reveal that prior results were incorrect.[3]

    Plaintiffs also point to statements made by Andrx and Teva about bupropion when those companies disclosed their third-quarter financial results. Andrx's statements, on their face, concerned third-quarter results, and the Court has also specifically held that Andrx's statements "suggested, at most, that Impax's *third quarter* results might disappoint investors" and that "Andrx's announcement cannot be construed to mean that Impax's first- and second-quarter financial statements were incorrect or would be restated," whether considered separately or in conjunction

---

[2] Stated differently, *Daou*, *Berson* and *Gilead* involved the disclosure of actual *numbers* reflecting the financial results of the alleged fraud.

[3] *See* note 1, *supra*.

Blank Rome LLP
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

1   with Impax's November 3 announcement.  January 2007 Order at 7-8.  Further, as defendants have

2   explained in their motion to dismiss the Third Amended Complaint, the Teva conference call on

3   which plaintiffs rely likewise concerned only Teva's third-quarter results and the statements in no

4   way indicated that Impax's first- and second-quarter financial statements were incorrect or would be

5   restated.[4]

6         In short, plaintiffs cannot escape (and thus do not mention) the plain facts here.  The Court

7   has numerous times held that Impax's November 3 press release did not disclose that Impax's

8   previously reported first- and second-quarter results were incorrect.  Even when read with Impax's

9   August 2004 press release (announcing second-quarter results), the most that the Court could

10  conclude was that it was "*reasonable to infer* that *the market understood* the company's November

11  3, 2004 announcement to *potentially implicate* 1Q04 and 2Q04 customer credits and revenues."  July

12  2007 Order at 9 (emphasis added).  *Metzler* now makes clear that this is not enough to plead loss

13  causation in the Ninth Circuit.

14        As *Metzger* explained, allegations of what the market understood, and possible or potential

15  implications, are insufficient.  They essentially resurrect the "inflated purchase price" standard

16  rejected by the Supreme Court in *Dura*, and open the door to the pernicious effects that Congress

17  sought to preclude with the Private Securities Litigation Reform Act.  This case is a prime example

18  of the wisdom of *Metzler*'s holding, for if it is reasonable to infer that the market understood the

19  press release to potentially implicate Impax's first- and second-quarter results, it is at the very least

20  equally reasonable to infer that the market understood the November 3 press release to potentially

21  implicate only third- or future-quarter results.  And on November 9 the market made emphatically

22  clear that any concerns raised by the November 3 press release pertained to the latter rather than the

23  former: when Impax disclosed that it was restating first- and second-quarter results due to the credits

24  given by Teva, the market heaved a big sigh of relief and bid up the price of Impax's stock.

25

---

26  [4] Plaintiffs also try to cast the November 3 press release as a disclosure of Impax's "true
    financial condition."  Plainly, that press release said nothing about Impax's "financial condition" and
27  even if it did, it would only be a comment about the company's financial condition generally, which
    Metzler makes clear is insufficient to allege loss causation.  Metzler, 2008 WL 2853402 at *9.
28                                      6

**Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

1  Plaintiffs simply have not alleged facts showing that any investor incurred any loss caused by
2  Impax's originally issued first- and second-quarter results.
3      Plaintiffs have not pleaded and cannot plead loss causation under *Metzler*, *Gilead*, *Berson* or
4  *Daou*. The Court should grant leave to file Defendant's Motion for Reconsideration and dismiss this
5  case with prejudice.
6
7                                          Respectfully submitted,
8  Dated:  August 15, 2008              BLANK ROME LLP
9                                          BINGHAM MCCUTCHEN LLP
10
11                                           /s/ Joseph O. Click
                                          JOSEPH O. CLICK (pro hac vice)
12                                           *Attorneys for Defendants*
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28