BLANK ROME LLP
MICHAEL JOSEPH (*pro hac vice*)
JOSEPH O. CLICK (*pro hac vice*)
HARDY VIEUX (*pro hac vice*)
TIMOTHY P. HARRIS (*pro hac vice*)
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Telephone:  202.772.5800
Facsimile: 202.572.5858
          -and-
LOUIS H. KOZLOFF (*pro hac vice*)
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103-6998
Telephone: 215.569.5500
Facsimile: 215.569.5555

BINGHAM MCCUTCHEN LLP
DALE BARNES (SBN 99273)
Three Embarcadero Center
San Francisco, California 94111
Telephone:  415.393.2522
Facsimile: 415.393.2286

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re IMPAX LABORATORIES, INC. SECURITIES LITIGATION | Master File No. C-04-4802-JW <br><br> <u>CLASS ACTION</u> |
| This Document Related to: <br><br> ALL ACTIONS | DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM IMPAX DEFENDANTS <br><br> DATE:  October 29, 2008 <br> TIME:  2:30 p.m. <br> COURTROOM:  The Honorable Richard G. Seeborg |

## I. INTRODUCTION

Defendants request leave to file this supplemental brief in opposition to Plaintiffs' Motion to Compel. It is warranted because Plaintiffs' reply brief raises entirely new issues and arguments that were not addressed in either their opening brief or in Defendants' opposition, all based on a registration statement that Impax filed with the Securities and Exchange Commission on October 10, 2008 (the "2008 Registration Statement"). Plaintiffs attempt to use the 2008 Registration Statement to connect Impax's failure to file its periodic SEC reports with the 2004 fraud alleged in the 4th AC and thereby justify their requests (nos. 21-24, 26-29, 46 and 50) for voluminous post-2004 documents stemming from the failure to file. By failing to disclose what the 2008 Registration Statement actually says, Plaintiffs misleadingly argue that it somehow confirms their theory that Impax's overstatement of its revenue for the first two quarters of 2004 was fraudulent, when in fact the 2008 Registration Statement confirms that the events surrounding Impax's failure to file its periodic reports have absolutely no relevance to those overstatements.

## II. ARGUMENT

### A. Impax's New Revenue-Recognition Policy.

The overstatements of revenue for the first two quarters of 2004 on which Plaintiffs' action is based related to revenue under Impax's strategic alliance agreement with Teva. The revenue for those two quarters was overstated because Teva had failed to include certain credits it had granted to customers when reporting its sales of bupropion to Impax. *See* Defendants' Opposition at 2. While Impax was unable to file its periodic SEC reports subsequent to the third quarter of 2004, Defendants' opposition shows that this was the result of the company's need to develop a new revenue-recognition policy for its strategic alliance agreements and that the SEC itself confirmed that the accounting issues underlying that need had nothing to do with the reasons Impax had overstated its revenues for the first two quarters of 2004. The 2008 Registration Statement explains the new revenue-recognition policy, which Impax has now adopted.

DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO
COMPEL PRODUCTION OF DOCUMENTS – C-04-4802-JW (RS)

**Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

The crux of Plaintiffs' new argument is that the new policy disclosed by the 2008 Registration Statement "appears to be precisely in line with what Plaintiffs allege Defendants should have done all along—deferred the recognition of revenue until they had all the information necessary to properly recognize the revenue." Plaintiffs, of course, do not bother to explain what Impax's new revenue-recognition policy is, and for good reason. That policy reflects that the issues that have driven Impax to change that policy have absolutely nothing to do with their claims and are issues that even their own accountant missed completely in his analysis of Impax's alleged "fraudulent" accounting.

In its quarterly report on Form 10-Q for the first quarter of 2004, Impax stated, "Revenues from product sales for these products under our strategic alliance are recognized at the time title and risk of loss transfers to Teva's customers." Supplemental Declaration of Joseph O. Click (Click Decl.), Ex. A at 5. In the 2008 Registration Statement Impax states that under its new policy, revenue under its strategic alliances is now recognized over the life of the related agreement. The pertinent notes to the financial statements explain:

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

. . .

*Revenue Recognition*
The Company recognizes revenue when the earnings process is complete, which under SEC Staff Accounting Bulletin No. 104, Topic No. 13, *Revenue Recognition*, is when revenue is realized or realizable and earned and there is persuasive evidence a revenue arrangement exists; delivery of goods or services has occurred; the sales price is fixed or determinable; and, collectibility is reasonably assured.

The Company accounts for revenue arrangements with multiple deliverables in accordance with Emerging Issues Task Force Issue No. 00-21, *Accounting for Revenue Arrangements with Multiple Elements* ("EITF 00-21"), which addresses the determination of whether an arrangement involving multiple deliverables contains more than one unit of accounting. A delivered item within an arrangement is considered a separate unit of accounting only if all of the following criteria are met:

- the delivered item has value to the customer on a stand-alone basis;
- there is objective and reliable evidence of the fair value of the undelivered item; and

- if the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item is considered probable and substantially in the control of the vendor.

Under EITF 00-21, if the fair value of any undelivered element cannot be objectively or reliably determined, then separate accounting for the individual deliverables is not appropriate. Revenue recognition for arrangements with multiple deliverables constituting a single unit of accounting is recognizable generally over the greater of the term of the arrangement or the expected period of performance, on a straight-line basis or on a modified proportional performance method.

. . .

**13. ALLIANCE AGREEMENTS**

. . .

**Revenue Recognition under the Teva Agreement:** The Company applied its accounting policy to determine whether the multiple deliverables within the Teva Agreement should be accounted for as separate units of accounting or as a single unit of accounting. The Company identified the following deliverables under the Teva Agreement, including: manufacture and delivery of 12 products,; research and development activities (including regulatory services) related to each product; and market exclusivity associated with respect to the products.

The Company determined no single deliverable represented a separate unit of accounting as there was not sufficient objective and reliable evidence of the fair value of any single deliverable. When the fair value of a deliverable can not be determined, it is not possible for the Company to determine whether consideration provided by Teva under the Teva Agreement is in exchange for a given deliverable. The Company thus concluded the multiple deliverables under the Teva Agreement represents a single unit of accounting.

The Company initially defers all revenue earned under the Teva Agreement and then recognizes such deferred revenue over the life of the Teva Agreement, estimated to be 18 years, measured from the June 2001 inception of the Teva Agreement through 10 years following the estimated time of the last product FDA Approval. The deferred portion of the revenue is recorded as a liability captioned "Deferred revenue—alliance agreements." Revenue is recognized using a modified proportional performance method, which results in a greater portion of the revenue being recognized in the period of initial recognition and the balance recognized ratably over the remaining life of the agreement.

Click Decl., Ex. B at F-13, F-37. Impax also explains the new SAA revenue accounting policy's modified proportional performance method:

Under the modified proportional performance method utilized by the Company, the amounts recognized for a given element in the period of

---

3
DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS – C-04-4802-JW (RS)

initial recognition is based upon the number of years elapsed prior to the respective elements' event occurring under the Teva Agreement relative to the estimated life of the Teva Agreement. Under this method the amount of revenue recognized in the year of initial recognition is determined by multiplying the total amount realized by a fraction, the numerator of which is the then-current year of the agreement and the denominator of which is eighteen years—i.e. the estimated life of the Teva Agreement. The amount determined during each remaining year is 1/18 of such amount. Thus, for example, with respect to profit share reported by Teva during 2005 (the fourth year of the agreement), 4/18 of the amount reported is recognized during 2005 and 1/18 of the amount is recognized during each of the remaining 14 years of the estimated life of the Teva Agreement.

*Id.*, Ex. B at F-38.

### B. The New Policy Has No Relation to Plaintiffs' Claims.

#### 1. Inconsistencies in Revenue Reflected in the 2008 Registration Statement Are Unrelated to the Fraud Alleged by Plaintiffs.

Plaintiffs contend they are entitled to all of the information regarding Impax's development of its new revenue-recognition policy for the Teva agreement—including all communications with Impax's accounting experts, its independent auditors, the SEC's Office of the Chief Accountant (OCA) and all internal communications and documents—because a table of selected financial data contained in the registration statement reflects that, applying Impax's new revenue-recognition policy, Impax had total revenues of $91 million and a net operating loss of $46.5 million in fiscal year 2004, which results are inconsistent with the revenue and net operating income for the first and second quarters of 2004 that Impax originally reported in May and August of 2004. To be sure, there is inconsistency. But once one reads and understands the new policy, it becomes crystal clear that the inconsistency has nothing to do with the allegations of fraud in this case.[1]

Again, the alleged fraud in this case consists of Impax's recognition of product-related revenue that was originally reported to Impax by Teva, but to which Impax was not entitled because of discounts and price adjustments that Teva gave to its customers for 2004 first- and second-quarter

---

[1] Plaintiffs have incorrectly inferred from the 2008 Registration Statement that Impax's 2004 financial statements have not been audited. While the registration statement is required to include audited financial statements for only three years and thus does not include any 2004 financial statements, Impax's 2004 financial statements have in fact been audited. *See* Click Decl. Ex. C.

Blank Rome LLP
Watergate 600 New Hampshire Ave., NW Washington, DC 20037

sales (but failed to report to Impax until after the third quarter of 2004). While Plaintiffs now claim (Reply at 3) that their allegations relate broadly "to the amount and timing of [Impax's] revenue recognition," the only alleged improprieties in Impax's revenue recognition identified by Plaintiffs and their expert in the 4th AC are Impax's recognition of revenue for bupropion sales when prices were not "fixed and determinable" and when Impax had not established or could not establish adequate return reserves. 4th AC, ¶¶ 84, 89-125, 419-36. The lower 2004 results reported in the 2008 Registration Statement, however, have nothing to do with prices or reserves for returns or any other reason why Impax might not be entitled to recognize the revenue. They have to do only with *when* the revenue should be recognized and are solely the result of Impax's change to a revenue-recognition policy that defers revenue properly received and then recognizes it over the remaining portion of the 18-year life of the agreement. It defers the revenue not because it doesn't know the correct amount of its share of the profits from Teva's product sales (as was the case in the first two quarters of 2004), but because the Teva agreement involves multiple deliverables (products, research and development, and market exclusivity) and application of EITF 00-21 requires that the revenue from all the deliverables be recognized over the life of the agreement.

Pursuant to that new policy, a substantial portion of revenue received in the early years of the Teva agreement is deferred and recognized in subsequent years. The "net sales" actually received by Impax from Teva in 2004 include the restated amounts for the first- and second-quarters of 2004, but, as explained in the 2008 Registration Statement, under the new policy Impax recognizes only 3/18 of the amount received in its 2004 financial results, and includes 1/18 of the 2004 revenue received in each of the remaining 15 years of the agreement.

The lower 2004 revenues reflected in the 2008 Registration Statement thus plainly do not involve any fraud, much less the fraud alleged in the 4th AC.

### 2. Impax's New Revenue-Recognition Policy Is Unrelated to the Views of Plaintiffs' Accounting Expert.

Plaintiffs assert that Impax's new revenue-recognition policy "appears to be precisely in line with what Plaintiffs allege Defendants should have done all along—deferred the recognition of revenue until they had all the information necessary to properly recognize the revenue." Plaintiffs' allegations are based on the opinions Kenneth Neumann, an accountant whose Declaration ("Neumann Decl.") Plaintiffs have attached as an exhibit to the 4th AC and as Exhibit B to the Declaration of Daniel J. Pfefferbaum submitted with Plaintiffs' reply brief.

On its face, Plaintiffs' claim is nonsense. Even a cursory review of Impax's new revenue-recognition policy makes clear that deferral of revenues received by Impax has nothing to do with any failure to "ha[ve] all the information" regarding Teva's accounting practices or product sales, as Plaintiffs claim. Again, deferral under the new policy is based on Impax's application of EITF 00-21 and its determination that the various deliverables are not divisible into separate units of accounting and must therefore all be accounted in the same manner pursuant to a policy that recognizes revenue over the estimated life of the agreement.

Moreover, a comparison of Impax's new accounting policy with the Neumann Declaration makes clears that the new policy is not even remotely, let alone "precisely," "in line" with Mr. Neumann's accounting views or the 4th AC's allegations. Nowhere in his declaration did Mr. Neumann suggest that Impax needed to adopt a revenue-recognition policy that "defers" revenue.[2] Rather, he concluded: "Upon reviewing the language of the [Teva agreement], it is my opinion that Impax could not recognize any revenues derived from sales under the [agreement] without an understanding of the terms and conditions of Teva's sales of Impax's products in general and as offered to specific customers." Neumann Decl., ¶ 4(c). He then went on to identify information

---

[2] Only at the very end of his 16-page Declaration (¶ 49) does Mr. Neumann even use the term "defer," there stating that "If, in fact, Teva could not estimate future returns of bupropion, Impax would have been required to defer all sales of bupropion . . . ." The obvious import of that statement was that the revenue should be deferred until the actual returns were known, not that it should be deferred and recognized over the life of the agreement.

DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS – C-04-4802-JW (RS)

**Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

that, in his opinion, Impax needed to have in order to recognize revenue under Impax's then-current method for accounting for revenue under the agreement and GAAP, including (1) knowledge of Teva's internal control system for recording sales of bupropion, (Neumann Decl., ¶¶ 16, 20); (2) Teva's marketing and sales policies generally (*id.*, ¶¶ 16, 18, 20); (3) the terms and conditions of Teva's sales of bupropion to each of Teva's customers (*Id.*, ¶¶ 20, 31, 39); (4) Teva's accounting policies and procedures related to sales under the SAA (*id.* ¶¶ 16, 18, 20, 3). None of this has anything to do with Impax's new revenue-recognition policy.

Mr. Neumann only mentions EITF-0021 in two paragraphs of his Declaration (¶¶ 29-30), stating that EITF 00-21 requires a determination that a "delivered item should be considered a separate unit of accounting" under specified criteria. He does not express an opinion, much less perform an analysis, of whether the various deliverables under the agreement are divisible into separate units of accounting. Indeed, other than the bupropion product, he does not mention any of the multiple deliverables identified by Impax in the 2008 Registration Statement. Instead, Mr. Neumann implicitly assumes—incorrectly, it turns out— that the various deliverables are divisible into separate units of accounting and concludes (¶ 30) that for Impax to recognize revenue from sales of bupropion in the first quarter of 2004 consistent with EITF 00-21, Impax "needed to be aware of, understand and evaluate Teva's terms and conditions," and that because Teva gave a price concession to one of its customers (one that it belatedly reported to Impax) "the sale price [was] an unreliable evidence of the fair value of the product."

The accounting issue that required Impax to devise a new revenue-recognition policy for the Teva agreement—whether the various deliverables thereunder are divisible into separate units of accounting, and if not, the development of a single revenue-recognition policy applicable to all deliverables—is an issue that Mr. Neumann missed altogether. It is hard to imagine how, under these circumstances, Plaintiffs can seriously assert that Impax's new revenue-recognition policy can possibly have any relation to the fraud alleged in the 4th AC. Their attempt to conflate these unrelated issues further demonstrates that the discovery they seek is a mere fishing expedition.

**Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

7
DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS – C-04-4802-JW (RS)

1   All in all, Mr. Neumann's declaration only serves to confirm the findings set forth in the
Opinions of the SEC and its ALJ that Impax's overstated (and subsequently restated) first- and second-quarter 2004 results—the sole basis for Plaintiffs' claims here—are unrelated to the Company's failure to file its subsequent SEC periodic reports and the development of the new revenue-recognition policy. The Court should deny Plaintiffs' Motion to Compel with respect to Document Request Nos. 21-24, 26-29, 46 and 50.

## II. CONCLUSION

For all of the foregoing reasons and those set forth in Defendants' Opposition, Defendants respectfully request that the Court deny Plaintiffs' Motion to Compel Production of Documents.

Dated: October 21, 2008        BLANK ROME LLP

BINGHAM MCCUTCHEN LLP

 s/ Joseph O. Click
JOSEPH O. CLICK (*pro hac vice*)
LOUIS H. KOZLOFF (*pro hac vice*)

*Counsel for Defendants*

**Blank Rome LLP**
Watergate 600 New Hampshire Ave., NW Washington, DC 20037

**CERTIFICATE OF SERVICE**

I certify that on October 21, 2008, I electronically filed with the Clerk of the Court using the ECF System a copy of Defendants' Supplement Brief in Opposition to Plaintiffs' Motion to Compel Production of Documents from Impax Defendants; Declaration of Joseph O. Click in Support of Supplement Brief in Opposition to Motion to Compel.  Service will by made electronically through the ECF system to all parties registered for electronic filing.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 21, 2008.

           s/ Joseph O. Click
          Joseph O. Click

**Blank Rome LLP**
Watergate  600 New Hampshire Ave., NW  Washington, DC 20037

DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS – C-04-4802-JW (RS)